# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
BRITTNEY COLLINS,
Defendant and Appellant.

S279737

Second Appellate District, Division Five
B322744

Kern County Superior Court
MF013183B

---

January 6, 2025

Justice Evans authored the opinion of the Court, in which Justices Liu, Groban, and Jenkins concurred.

Justice Liu filed a concurring opinion, in which Justices Groban and Evans concurred.

Justice Kruger filed a concurring opinion.

Chief Justice Guerrero filed a dissenting opinion, in which Justice Corrigan concurred.

---

PEOPLE v. COLLINS

S279737

Opinion of the Court by Evans, J.

This case concerns implied malice murder liability based on a parent's failure to act — specifically, their failure to protect their child from another person's fatal act. Defendant Brittney Collins was convicted of second degree murder for the death of her two-month-old son, Abel James Norwood, who was killed by his father, Matthew Norwood. Norwood committed the fatal act while Abel was under Norwood's care and Collins was in another room. Given the facts established at trial, we recognize this is a close case. We hold, however, that the evidence was insufficient to convict Collins of second degree murder. Applying the law governing implied malice murder in the distinct context of a prosecution based on a failure-to-protect theory, the evidence fails to establish Collins harbored the requisite mens rea to convict her of second degree murder under either a direct aider and abettor theory or a direct perpetrator theory. Accordingly, we reverse the judgment of the Court of Appeal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Collins and Norwood began their romantic relationship in 2017. Both Collins and Norwood used methamphetamine, and Norwood also used heroin. In early 2018, Collins became pregnant with their child. While Collins stopped using drugs during her pregnancy, Norwood's drug use continued.

When Collins was pregnant, Norwood made several comments, including in Collins's presence, that he did not want

1

to be a dad and did not want the baby. When Collins was seven months pregnant, Norwood told a neighbor he did not want to be a dad and tried poking Collins in the abdomen with a screwdriver. Norwood physically abused Collins while she was pregnant, commenting at one point that he wanted to make her lose the baby.

Collins suffered complications during her pregnancy, including gestational diabetes and high blood pressure. On August 16, 2018,[1] she gave birth to Abel by an emergency cesarean section. Collins nearly died during childbirth. After the birth, Abel was hospitalized for a week in the neonatal intensive care unit. Collins developed an infection in her uterus from the cesarean section and was placed on antibiotics. As Collins recovered from childbirth, Norwood's drug use, volatility, and abuse continued, as described in further detail below.

Following Abel's birth, Collins brought Abel to three "well-baby" visits — the last of which occurred on October 16. In addition to these visits, Collins brought Abel to urgent care on October 10 after noticing that he seemed to have difficulty when hiccupping. A nurse practitioner conducted a full body physical examination of Abel and did not observe any physical injuries. She determined Abel had acid reflux. During Abel's last wellness check on October 16 — the day before the fatal act — Abel received his two-month vaccination shots. The same nurse practitioner performed a physical examination with Abel undressed, examining his skull, lungs, heart, mouth, and extremities, along with his body and skin. She also pushed on

---

[1] Unless otherwise indicated, all relevant events occurred in 2018.

his abdomen to check for signs of pain. She did not observe any physical injuries. Collins informed her that Abel's leg was a little swollen, but the nurse told Collins it " 'look[ed] fine' " and recommended to bring him back if it worsened. At these appointments, Collins did not report any abuse or suspected abuse of herself or Abel.

On October 17, Collins was recovering on the couch from complications caused by the cesarean section while Norwood acted as Abel's primary caregiver. As Abel's parents, Collins and Norwood shared caretaking responsibilities. Collins's grandmother, who also lived with Collins and Norwood, was present.

Earlier that morning, Norwood had used methamphetamine, and Collins and Norwood argued about his drug use. Collins told Norwood to move out. Norwood became upset and broke Collins's cell phone.

Throughout the rest of the day, Collins was in the front room, accompanied by her grandmother, on the couch. She was periodically sleeping and also applying for jobs. Abel was with Collins on the couch earlier in the morning and slept in the back bedroom for most of the day.

At 1:00 p.m., Collins woke up from a nap and checked on Abel while he was sleeping in the back bedroom. Initially, she thought his breathing seemed shallow, but then it normalized. She returned to the couch in the front room.

At 3:30 p.m., Abel woke up from sleeping in the back bedroom. Collins and her grandmother were still in the front room, and Norwood told them that he was going to change and feed Abel. Collins offered to feed and change Abel, but Norwood

insisted he do so himself. Norwood went to the back bedroom, and Collins and her grandmother remained in the front room.

Sometime later, Collins heard a bang from the back bedroom — which turned out to be Norwood committing the fatal act. She did not hear Abel cry after the noise. Collins described the noise as similar to a cell phone being dropped from one foot high onto a table. Over the prior several weeks, she had heard a similar noise five to six times when Norwood was caring for Abel by himself. On those prior occasions, Abel had cried following the bang and Collins would check on Abel and ask Norwood about the noises. On those previous occasions, Norwood told her that he accidentally kicked the bassinet or knocked into a tote or the door. On this occasion, Collins remained in the front room and did not check on Norwood and Abel in the back bedroom.

Around 15 to 20 minutes after Collins heard the loud noise, Norwood came back to the front room. He told Collins and her grandmother that Abel did not want his bottle and that Abel had gone back to sleep. Norwood, who was acting antsy, then left for an errand. Collins remained in the front room.

Approximately one hour later, Collins checked on Abel and found him in a state of medical emergency. He appeared to be having a seizure. He was foaming at the mouth and his body was pale. Collins screamed and got help from two of her neighbors as her grandmother held Abel. One of the neighbors called 911. Abel was running a high fever, and the other neighbor put cool water on him. Collins was crying hysterically. Paramedics arrived and transported Abel to the hospital. The responding medics did not observe any physical injuries.

Once Abel was transported to the hospital, his injuries started to show externally, with bruising. Medical personnel obtained x-rays and a CT scan. The x-rays and scan revealed extensive injuries, largely to Abel's skull and ribs, consistent with child abuse. Based on these findings, authorities questioned Collins and Norwood at the hospital.

On October 18, police executed a search warrant of Collins's grandmother's residence. They recovered a small amount of drugs and a hypodermic needle. There was also a suitcase packed with men's clothing on the bed.

After agreeing to speak with officers at the police station, Collins and Norwood sat in the back of a patrol car. During their conversation in the back of the car, Norwood told Collins he would never throw her under the bus, and Collins assured him that she would not throw him under the bus either.

During an initial police interview, Collins claimed the drugs were hers, although they belonged to Norwood. She stated that Norwood was not abusive and suggested that her grandmother may have dropped Abel. She elaborated that her grandmother had physical limitations and would pick Abel up even though she directed her grandmother not to do so. When Collins was informed of the extent of Abel's injuries, she said, "I wouldn't bring this little boy into the world to hurt him. Especially, that I might not even get another one." She explained she had polycystic ovarian syndrome and had been diagnosed with infertility.

At one point, the detectives told Collins: "[M]om's the person that watches the kid. Mom's the person that takes care of the baby. Mom's the person that protects their baby. Right?" They later asked, "Okay so what does mother intuition telling

[*sic*] you?" Collins replied, "That his dad made a mistake because of the drugs."

The next day, detectives interviewed Collins a second time. During that interview, Collins described physical abuse that Norwood had inflicted upon her. When Collins maintained she did not know how Abel was injured, the detective asked Collins "what is your gut as a mother telling you right now? Mo- moms are built to have an — an instinct. And — and, to just in their gut know certain things, what is your gut telling you?" Collins later stated, "I know earlier you asked me about in- intuition and stuff and like what I think. I really think his dad did it."

Collins elaborated that she suspected Norwood had been abusing Abel when she had heard loud noises coming from the back bedroom on five or so different occasions when Norwood cared for Abel alone. On those past occasions, Abel would cry, and Collins would check if he was okay; Norwood would provide an innocent explanation and question whether she was accusing him of abuse. She told the detectives that, the day after Abel was taken to the hospital, she bumped into the door and it did not make the same sound that Norwood caused. She explained that, although she questioned Norwood, she told herself, "[O]h that's [Abel's] dad and I'm supposed to love and trust him. I — I believe what he tells me. . . . That's dad. That's daddy. I trust him."

Collins then described Norwood's past acts of abuse towards both herself and Abel — which she attributed to Norwood's rage from heavy drug use. During her pregnancy, Norwood choked Collins and kneed her in the stomach, although he later claimed it was accidental. When Collins was nine

months pregnant, Norwood pushed Collins and told her he would make sure Abel was not born. She believed Norwood was trying to make her lose Abel when he pushed her down hard and jumped on top of her when she was pregnant. Norwood also kicked her in the face, knocking her tooth loose. A week before Norwood's fatal act, he hit her so hard she was sore for a week, slammed her, and hit her nose.

Regarding Norwood's abuse of Abel, Collins explained Norwood "slam[med] dope all the time" and was often "too high to deal with" Abel. She stated Norwood would partially cover Abel's mouth when Abel was crying loudly and sometimes bounced him too hard.[2] She described how she intervened in

---

[2] The Attorney General asserts Collins saw Norwood "choke" Abel. Collins first used the "choking" description in speculating that Norwood covering Abel's mouth was "possibly maybe even choking him 'cause he chokes me so why would he not choke a baby?" Shortly thereafter, she summarized Norwood's abuse to the detectives, including "what looks like choking which probably — it doesn't look like choking, it was choking." While a detective testified at the preliminary hearing that Collins had stated "Norwood forcibly place[d] his hand over Abel's mouth as well as place[d] his hand forcibly over his mouth and neck area," a review of the record reveals Collins did not say Norwood put his hand around Abel's neck. Relatedly, at oral argument, the Attorney General acknowledged his "suffocating" description referred to Norwood covering Abel's mouth.

The dissent describes our discussion of the "choking" references as "labored." (See dis. opn., *post*, at p. 10.) More generally, it criticizes our recitation of the facts — which largely tracks that of the Attorney General and the Court of Appeal — and offers a "corrective" (*ibid.*) of over 20 pages. Our command as a reviewing court in evaluating a sufficiency of the evidence claim is to consider the actual evidence before the jury and reasonable inferences favorable to the prosecution that the jury

those situations by telling Norwood to stop or by taking Abel away from Norwood. She maintained she "really didn't know" Abel was being injured prior to the fatal incident. She said she had witnessed Norwood roll Abel over by his leg, bump his head into things, squeeze him "too tight," and push down on his chest "enough to probably break a rib." On one occasion, she saw Norwood and Abel on the bed, with Abel's eyes red, and thought Norwood might have hit Abel although she "never got there fast enough." During the interview, she commented, "he chokes me so why would he not choke a baby?"

When a detective pointed out Collins had in fact witnessed abuse, Collins responded she had told Norwood to leave a few times and stated she was afraid to call the police. She indicated Norwood had threatened her if she ever sent him to jail. She stated she was scared of Norwood trying to kill her. She explained Norwood put a camera in their room when she was four months pregnant "so [he] could watch [her]." Collins also reported that Norwood overdrew all of her bank accounts and that, consequently, she no longer had her own bank accounts. She repeated, "If I could, I would've called the police on him the first time I saw him put his hand over [Abel's] mouth and manned up, not been afraid of him or called the police the first time he hit me when I was pregnant." She was aware Norwood had previously been convicted of domestic violence. She stated

_____

could have drawn from that evidence. The dissent's descriptions (such as Collins having "friends and former foster parents to help" based on her former foster mother's testimony that she "probably" would have let Collins live with her) and phrasing (such as "callously suggested") reveal its effort to import its own view of the evidence into the calculus and is therefore inconsistent with this command.

that, based on Norwood's abuse of her, she believed Norwood was responsible for Abel's injuries.

On October 24, Abel died at two months old from blunt force trauma.

On December 19, an information was filed charging Collins and Norwood with murder (Pen. Code, § 187, subd. (a)) and assault of a child under eight years old resulting in death (Pen. Code, § 273AB, subd. (A)).

During her pretrial detention, Collins used a razor to cut her wrists and said her husband killed her son. She was taken to the infirmary.

At trial, a forensic pathologist testified Abel had fresh injuries from blunt force trauma on the right back side of his head with one external head injury — a bruise on the top side of his forehead. The pathologist generally referred to the injuries being caused by one blow and ultimately concluded the injuries were caused by Abel being swung by his leg into a hard surface. The pathologist also stated that Abel had a fresh fracture to his left leg. The pathologist opined Abel's injuries were caused by someone using his leg as a handle and throwing him against either the wall or the ground. The pathologist, as well as a radiologist, opined Abel had other fractures — mainly to his ribcage — nearly all of which occurred seven to fourteen days before the fatal injury. An ophthalmologist testified that an examination of Abel's eyes revealed injuries consistent with trauma.

The nurse practitioner testified about her physical examinations of Abel. During her examinations of Abel on October 10 and October 16, she observed no physical injuries. She testified that she looked at Abel's eyes and palpitated his

ribcage. She "saw no signs of bruising, no signs of trauma, no signs of cuts, scrapes, anything like that." She did not note anything following Abel's assessment because "[h]e seemed like a normal two-month baby." She did not request any X-rays for Abel because she "didn't see any reason to."

In her defense, Collins testified she saw Norwood bounce Abel too hard and heard loud bangs five or six times when Norwood cared for Abel. She testified she never saw Norwood physically hurt Abel. She testified she had lied about witnessing Norwood bump Abel's head into things and pin Abel down because she wanted to return to Abel and thought the detectives would let her go if she told them what they wanted to hear. She described some of the physical abuse she endured during her pregnancy — including Norwood pushing her down and choking her. She maintained that she was afraid of confronting Norwood about whether he was hurting Abel. She testified that she relied on Norwood to help take care of Abel due to her complications from the cesarean section. Collins explained that she and Abel relied on Norwood's income. She also stated she attributed Norwood's rage to his drug use. She testified that she had confronted Norwood about his drug use that morning, that she had told Norwood to move out, and that Norwood was packing to leave. Collins stated, "I should have tried harder to make him leave" and she "never intentionally failed to act" to protect Abel.

Collins also presented various character witnesses, including two of her foster parents, who testified as to her honesty. Collins's grandmother, who lived with Collins and Abel, testified that Collins was a caring and attentive mother and that Abel had no visible injuries prior to October 17. Her grandmother testified that Collins had been recovering on the couch and applying for jobs that day. Her grandmother stated

that Collins and Norwood had gotten into an argument around 9:30 a.m. During the argument, Norwood broke Collins's phone and Collins had told Norwood to move out.

The prosecutor's theory was that Collins knew "[Norwood] was a chronic methamphetamine user, a violent abusive person and [Collins] let him stay near Abel and inflict injuries." The prosecutor continued: "This is the person she's letting watch her child. [Norwood] was abusive . . . choked her, kneed her while pregnant, kicked her." The prosecutor argued Collins knew she should have called the police, but she picked Norwood over Abel.

The trial court instructed the jury on two theories of second degree murder as follows: (1) Collins directly aided and abetted Norwood in the commission of the murder (CALCRIM Nos. 400 & 401); and (2) she was a direct perpetrator of the murder based on her failure to act (CALCRIM No. 520).[3] The trial court also gave a special instruction regarding the parental duty to act, which provided: "A parent has a legal duty to his or her minor child to take every step reasonably necessary under the circumstances in a given situation to exercise reasonable care for the child, to protect the child from harm, and to obtain reasonable medical attention for the child."

On October 21, 2020, Collins's jury convicted her of second degree murder.[4] Her jury found her not guilty of assault of a

---

[3] The Judicial Council has since revised or supplemented these jury instructions following *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*).

[4] Collins and Norwood were tried jointly with separate juries. Norwood's jury convicted him of second degree murder and assault on a child by means of force likely to cause great bodily injury resulting in death. The trial court sentenced him to 25 years to life.

child under eight years old resulting in death but guilty of the lesser included offense of assault with force likely to cause great bodily injury. The trial court sentenced Collins to 15 years to life and stayed the remaining term of three years for the assault count.

The Court of Appeal affirmed Collins's murder conviction on the ground that Collins "knew of Norwood's abuse of Abel but intentionally failed to take any reasonable steps to protect the baby — including on the day in question when [she] knew Norwood was high and still angry from their earlier argument." The Court of Appeal further reasoned Collins knew Abel would be fussier than usual having just had his vaccination shots, did not check on Abel after hearing a bang, and protected Norwood at his direction after Abel's hospitalization. The Court of Appeal ultimately concluded "a reasonable juror could find [Collins], by inaction and even some affirmative actions, knowingly failed to protect her son and thereby aided and abetted Norwood's murder of Abel."

## II. DISCUSSION

We granted review to determine whether sufficient evidence supports Collins's second degree murder conviction for the death of her infant son, Abel, based on her failure to protect him from his father, Norwood. Below, we clarify the requisite elements of implied malice murder in the distinct context of conferring criminal liability based on one's failure to act, and apply those elements as clarified to the particular facts of this case.

In considering a sufficiency of the evidence claim, we review "the whole record in the light most favorable to the judgment below to determine whether it discloses substantial

evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 (*Johnson*).) Substantial evidence is " 'evidence that "reasonably inspires confidence and is of 'solid value.' " ' " (*People v. Marshall* (1997) 15 Cal.4th 1, 34.)[5]

" 'Evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence, it merely raises a possibility, and this is not a sufficient basis for an inference of fact.' [Citation.] The substantial evidence rule mandates consideration of the weight of the evidence before deferring to the conclusions drawn from the evidence by the trier of fact. '[I]n determining whether the record is sufficient . . . the appellate court can give credit only to "substantial["] evidence, i.e., evidence that reasonably inspires confidence and is "of solid value." ' " (*People v. Kunkin* (1973) 9 Cal.3d 245, 250 (*Kunkin*).)

A jury must avoid " ' "unreasonable inferences and not . . . resort to imagination or suspicion." [Citation.]' [Citation.] 'Mere conjecture, surmise, or suspicion is not the equivalent of reasonable inference and does not constitute proof.' " (*People v. Anderson* (1968) 70 Cal.2d 15, 24 (*Anderson*).)

---

[5] Although the dissent says that today's opinion is not faithful to the standard of review, our analysis takes no issue with that standard. The guidance that we undertake involves the fine distinctions in criminal liability — here, second degree implied malice murder in the failure to protect context. It is particularly crucial (and helpful) that we undertake that task in cases that can be characterized as "close."

## A. LIABILITY BASED ON FAILURE TO ACT

As an initial matter, the parties agree that Collins's liability — as either an aider and abettor or a direct perpetrator — would be based on her parental duty to act. Typically, liability for a crime requires an individual to engage in affirmative conduct. However, criminal liability may be based on a "negative act" — a willful omission or failure to act — where there is a duty to act. (1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Elements, § 23, p. 296.) A duty to act may derive from the express terms of a statute, another statute, or common law. (*People v. Heitzman* (1994) 9 Cal.4th 189, 197–198 (*Heitzman*).)

We join the majority of our sister courts in recognizing a parent's failure to act can constitute an affirmative act for the purposes of criminal liability in some situations. (See *State v. Walden* (N.C. 1982) 293 S.E.2d 780, 784 (*Walden*); *People v. Stanciel* (Ill. 1992) 606 N.E.2d 1201, 1211 (*Stanciel*); *State v. Edgar* (Kan. 2006) 127 P.3d 1016, 1023–1024; but see *Commonwealth v. Raposo* (Mass. 1992) 595 N.E.2d 773, 777 [a parent's inaction cannot provide a basis for accessory liability]; *State v. Jackson* (Wn. 1999) 976 P.2d 1229, 1233–1235 [same].) As this court has recognized, "[a] criminal statute may . . . embody a common law duty based on the legal relationship between the defendant and the victim, such as that imposed on parents to care for and protect their minor children." (*Heitzman, supra*, 9 Cal.4th at p. 198, citing LaFave & Scott, Criminal Law (2d ed. 1986) § 3.3, pp. 203–204 and *People v. Burden* (1977) 72 Cal.App.3d 603 (*Burden*).)

We agree with the general principle articulated in *People v. Rolon* (2008) 160 Cal.App.4th 1206 (*Rolon*) that, based on

common law, " '[a] parent has a legal duty to his or her minor child to take every step reasonably necessary under the circumstances in a given situation to exercise reasonable care for the child, to protect the child from harm, and to obtain reasonable medical attention for the child' " (*id.* at p. 1213) and "aiding and abetting liability can be premised on a parent's failure to fulfill his or her common law duty to protect his or her child from attack" (*id.* at p. 1219). *Rolon*, however, allowed for murder liability based on a parental duty to act under the natural and probable consequences doctrine. (*Ibid.*) Specifically, *Rolon* provided: "[L]iability as an aider and abettor requires that the parent, by his or her inaction, intend to aid the perpetrator in commission of the crime, or *a crime of which the offense committed is a reasonable and probable outcome.*" (*Ibid.*, italics added.) Senate Bill No. 1437 (2017–2018 Reg. Sess.) has since eliminated the natural and probable consequences doctrine basis for aider and abettor murder liability "to more equitably sentence offenders in accordance with their involvement in homicides." (Stats. 2018, ch. 1015, § 1.) Collins's conviction occurred in 2020, following the effective date of Senate Bill No. 1437. To the extent *Rolon* permitted murder liability based on a parental duty to act under the natural and probable consequences doctrine, it is no longer good law and may not control the outcome of this case.

Importantly, the parental duty to protect has bounds. To confer criminal liability, parents must be aware that their duty to protect has arisen. Parents are not required to " 'place themselves in danger of death or great bodily harm in coming to the aid of their children.' " (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 745 (*Swanson-Birabent*), quoting *Walden*, *supra*, 293 S.E.2d at p. 786.) What is reasonably possible for a

parent to do to protect their child from harm or to stop an attack depends on the circumstances of each individual situation. (*Ibid.*) "[T]he relative size and strength of the parties involved is relevant to a determination of what is reasonable." (*Rolon*, *supra*, 160 Cal.App.4th at p. 1220.) "In some cases, depending upon the size and vitality of the parties involved, it might be reasonable [for] a parent to physically intervene and restrain the person attempting to injure the child. In other circumstances, it will be reasonable for a parent to go for help or to merely verbally protest an attack upon the child." (*Walden*, *supra*, 293 S.E.2d at p. 786.)

When a factfinder evaluates what reasonable steps were available for the parent to protect their child, the relationship of the direct perpetrator to the child will frequently be highly relevant. Co-parents have their own duty to protect and their own parental rights and obligations. When the abusive person is the child's co-parent, the parent shares the fundamental right to the "companionship, care, custody, and management" of their child. (*In re B.G.* (1974) 11 Cal.3d 679, 688; *In re Carmaleta B.* (1978) 21 Cal.3d 482, 489 ["[p]arenting is a fundamental right"].) A parent has rights and obligations relating to their child, whereas a stranger has none (*Troxel v. Granville* (2000) 530 U.S. 57, 100–101 (conc. opn. of Kennedy, J.)), and a parent may not unilaterally prevent the other parent's contact with their child. (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816.) As such, a parent may be more limited in what they can reasonably be expected to do to protect their child from the other parent, as compared to a non-parent.

Furthermore, there are frequently additional complexities in considering what reasonable steps can be taken for an abused parent to safely navigate around or leave an abusive co-parent.

In the context of domestic violence, " '[l]eaving an abusive relationship or ending violence is a complex process.' " (*In re I.B.* (2020) 53 Cal.App.5th 133, 156.) Importantly, a significant body of social science evidence demonstrates that the risk of being killed by one's abuser increases significantly when a victim of intimate partner violence attempts to leave their abuser. (Comment, *Battering Mothers for Their Abuser's Crimes* (2018) 52 U.S.F. L.Rev. 149, 152–153 (hereafter Comment); *id.* at p. 152 ["a woman's risk of being killed by her abuser increases by seventy-five percent when she leaves her abuser"]; see Jacobs, *Requiring Battered Women Die: Murder Liability for Mothers Under Failure to Protect Statutes* (1998) 88 J. Crim. L. & Criminology 579, 581 (hereafter Jacobs).) Again, parents have no legal duty to place themselves in danger of death or great bodily harm in coming to the aid of their children.

We further clarify today that, while criminal liability based on the failure-to-protect doctrine does not necessarily require that the parent be present for or actively participate in the perpetrator's acts, liability for murder on a failure-to-protect theory is appropriately reserved for individuals who actually know to a substantial degree of certainty that a life-endangering act is occurring or is about to occur and failed to act in conscious disregard for life.

As a general rule, malice is implied when the defendant deliberately performs an act, knowing that their conduct endangers the life of another, and acts with conscious disregard for life. (E.g., *Reyes*, *supra*, 14 Cal.5th at p. 989.) When, however, the defendant has not committed any "act" at all, but instead is charged with murder based on failure to protect the victim from acts committed by another, this inquiry necessarily becomes more nuanced. As explained in greater detail below,

17

existing case law addressing murder liability based on failure to protect demonstrates the nature of the mens rea requirement in this context, as compared to more typical implied malice murder prosecutions in which the focus is on the defendant's own harmful actions that led to the victim's death.  Thus, courts have found liability in failure-to-protect cases when the defendant was present, and thus contemporaneously aware of the life-endangering harm being inflicted on the victim, or knew, to substantial certainty, that the life-endangering harm would occur.  (See *post*, pp. 22, 27–29.)  These conclusions make sense.  A failure to act can imply malice only when the defendant has a substantial degree of certainty that a third party is inflicting, or will inflict, life-threatening harm; only then can it be said that the defendant knows that failure to intercede, too, will endanger the victim's life, and that the defendant's choice to do nothing has been made with conscious disregard for that life.

The requirement of a sufficiently blameworthy mental state is critical to prevent the failure-to-protect doctrine from giving rise to a "broad, nonspecific" liability out of proportion to the defendant's culpability for harm they did not inflict, stemming from risks they did not create.  (*People v. Ware* (2022) 14 Cal.5th 151, 165 (*Ware*); see *ibid.* [describing the specific intent required to support an unusual gang-related conspiracy theory].)  Thus, failure to protect homicide liability is limited to situations wherein the parent knew of the perpetrator's intent to commit the charged crime because they saw it being carried out, or because they had reason to know, to a substantial degree of certainty, that it was occurring or would occur and failed to act in conscious disregard for life.  Again, this limitation is reflected in the failure-to-protect cases, as discussed *post*.

With these principles in mind, we turn to the issue of whether sufficient evidence supports Collins's second degree murder conviction due to a failure to act.

## B. DIRECT AIDER AND ABETTOR THEORY OF LIABILITY

We first consider whether the evidence is sufficient to sustain Collins's murder conviction based on a direct aider and abettor theory of liability. Applying the standard we recently clarified in *Reyes*, *supra*, 14 Cal.5th 981, we hold Collins did not have the requisite mens rea to support direct aider and abettor liability.

In *Reyes*, we explained what is required to establish implied malice murder based on aiding and abetting liability. " 'In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (*Reyes*, *supra*, 14 Cal.5th at p. 991.) "The aider and abettor must know the direct perpetrator intends to commit the murder or life-endangering act and intend to aid the direct perpetrator in its commission. It is this mental relationship to the perpetrator's acts that confers liability on the aider and abettor." (*People v. Curiel* (2023) 15 Cal.5th 433, 468.) "The requisite intent is a

subjective one — the defendant must have ' "*actually appreciated* the risk involved." ' " (*People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485, 501.)

For murder liability to attach to a parent as an aider and abettor based on their failure to protect, the parent must knowingly fail to protect their child from the life-endangering act for the purpose of facilitating that life-endangering act and such failure to act must in fact assist in the commission of the life-endangering act. (*Rolon, supra,* 160 Cal.App.4th at p. 1219; *ibid.* ["a parent who knowingly fails to take reasonable steps to stop an attack on his or her child may be criminally liable for the attack if the purpose of nonintervention is to aid and abet the attack"].) To establish that the parent's failure to act in fact assisted the commission of the life-threatening act, it must be " 'shown that the defendant said or did something showing his [or her] consent to the criminal purpose and contribution to its execution.' " (*Swanson-Birabent, supra,* 114 Cal.App.4th at p. 745.) It bears emphasizing that a parent's "mere 'presence at the scene of a crime or failure to prevent its commission [is not] sufficient to establish aiding and abetting.' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1024.)

### 1. Mens Rea as an Aider and Abettor

The evidence is insufficient to establish that Collins harbored the requisite knowledge and intent to convict her of implied malice murder as an aider and abettor.

There is no evidence that Collins knew with substantial certainty that Norwood intended to commit the life-endangering act — i.e., critically injure Abel, much less swing him by the leg and throw him into a hard surface — before or during Norwood's commission of that act. Collins (and her grandmother) were

under the impression that Norwood would be changing and feeding Abel as he had done before. Collins and her grandmother remained in the front room — where they had been throughout the day — when the act occurred. At one point, Collins heard a "bang" noise, which turned out to be Norwood's completed commission of the fatal act. Collins heard similar noises when Norwood was alone with Abel on previous occasions and afterward found Abel crying but not visibly injured. On this day, Collins did not hear Abel cry after the noise. When Norwood returned to the front room 15 to 20 minutes after the bang, he told Collins and her grandmother that Abel did not want his bottle and that Abel had gone back to sleep. Norwood seemed antsy and left the house, while Collins remained in the front room. When Collins next checked on Abel approximately one hour later, Collins saw Abel was in a state of medical emergency. She screamed and got medical attention immediately. This evidence does not support a reasonable inference that Collins knew Norwood intended to commit the fatal act prior to or during its commission.

The Attorney General maintains the jury could reasonably infer that Collins knew "at least as the attack happened" that Norwood was attacking Abel on the morning of October 17 in a way that was dangerous to human life. The Attorney General bases this assertion on the evidence that Collins knew Norwood had used methamphetamine that morning, knew that he was angry enough to "break her cell phone," "knew that Norwood's use of methamphetamine had caused him to commit specific acts of abuse against Abel in the past," and "heard thumping coming from the bedroom consistent with sounds she had heard during prior abusive incidents that were dangerous to Abel's life."

First, there was not sufficient evidence that Collins knew that Norwood was engaged in a life-endangering act against Abel "as the attack happened." Contrary to the Attorney General's suggestion, this is not a case where a parent fails to act upon witnessing their child being attacked. For instance, in *Swanson-Birabent*, *supra*, 114 Cal.App.4th 733, the victim's mother was convicted of lewd acts on a child based on aiding and abetting her boyfriend's commission of lewd acts on her five-year-old daughter. (*Id.* at p. 737.) On two occasions, the mother stood close to her boyfriend and daughter as she watched her boyfriend digitally penetrate her daughter. (*Ibid.*) The *Swanson-Birabent* court explained, "Instead of attempting to stop [her boyfriend] by words or actions, [the victim's mother] stood by and watched as he committed a lewd act on the victim. In failing to act, she both encouraged the victim to comply with [her boyfriend] rather than resist, and she encouraged [her boyfriend] to continue molesting the victim." (*Id.* at p. 746.) The court also concluded the mother aided her boyfriend since her knowledge of her boyfriend's actions and her intent "arose sometime during the commission of the molestation." (*Id.* at p. 743.) Here, on the other hand, there is no evidence Collins knew Norwood was committing a life-endangering act prior to or during its commission. Unlike the defendant in *Swanson-Birabent*, Collins was not in the same room where the act took place and did not otherwise observe or participate in it. While actual presence is not required to establish liability based on a failure to protect, there was no evidence supporting a reasonable inference Collins was aware of the attack as the attack happened.

Second, the evidence that Collins knew Norwood used methamphetamine six hours earlier and was angry with her

that morning does not support a reasonable inference Collins knew of Norwood's intent to commit the life-endangering act against Abel on the afternoon of October 17. The Attorney General mischaracterizes the record by incorrectly stating Norwood's attack on Abel occurred in the morning; it actually occurred in the afternoon. The fatal attack did not occur immediately after Norwood used drugs and broke Collins's phone that morning. The attack occurred approximately six hours later, sometime after 3:30 p.m. While there is evidence Norwood was angry with Collins around 9:30 a.m., there is no evidence he was still upset six hours later when he went to change and feed Abel and ended up committing the life-endangering act. The evidence of Norwood's drug use and emotional state that morning do not support a reasonable inference that Collins knew that Norwood intended to fatally injure Abel.

More generally, we find that Norwood's anger towards Collins and his property damage of her phone do not support a reasonable inference that Collins knew of Norwood's intent to commit *a life-endangering act* against *Abel* on the afternoon of October 17. We note, however, that even if Norwood's anger towards Collins could support an inference about Collins's knowledge of the danger Norwood posed to Abel, it would presumably also raise an even stronger inference about the danger Norwood posed to *Collins*. This would tend to undermine liability for failure to carry out a duty to protect, rather than support it. In the law generally, courts must consider evidence of intimate partner violence as a mitigating circumstance or evidence that otherwise diminishes culpability. (See, e.g., Pen. Code, § 1170, subd. (b)(6)(C) [directing courts to impose the lower term where the defendant was a victim of intimate

partner violence]; *id.*, subd. (d)(8)(C) [providing that a court may resentence an individual to a lesser term based on their experience as a victim of intimate partner violence]; Pen. Code, § 1172.1, subd. (a)(5) [directing courts, in evaluating whether to recall a sentence, to consider whether intimate partner violence was a "contributing factor" in the defendant's commission of the offense].)  The law of failure-to-protect homicide, too, recognizes that it is problematic to use the fact that an individual has been abused by their partner to hold that individual criminally liable for their partner's conduct.  It should be done, if at all, with caution.  In the context of aiding and abetting based on a parent's failure to act, the evidence of intimate partner violence is most clearly pertinent to the inquiry of whether the parent risked danger of death or great bodily harm in coming to the aid of their children, which would preclude liability.  (See *Swanson-Birabent*, *supra*, 114 Cal.App.4th at p. 745.)  And in this case, it was Collins's act of confronting Norwood about his drug use and demanding he move out — steps that were taken to protect herself and Abel — that triggered Norwood's angry outburst towards Collins and his damage to her phone.  In all events, Norwood's volatility towards Collins and damage to her property failed to establish Collins knew Norwood would commit a life-endangering act against Abel later that day.

Third, the evidence of Collins's knowledge of Norwood's previous abuse of Abel does not support a reasonable inference that Collins knew to a substantial degree of certainty that Norwood intended to commit life-endangering abuse against Abel on the afternoon of October 17.  Although Collins testified that she had lied to detectives about witnessing dangerous abuse, the jury reasonably could have determined Collins indeed knew that Norwood was abusing Abel in a manner consistent

with her statements to the detectives and the medical testimony.[6]  Imaging revealed serious injuries to Abel that predated his fatal injury and were consistent with Collins's description of the abuse to the detectives:  at least eight fractures to Abel's ribs, several of which indicated "extreme chest compressions" and "an extremely violent shaking process"; multiple smaller fractures to Abel's arms and legs; and retinal hemorrhages too numerous to count that were associated with violently shaking Abel.  While the evidence of Norwood's past abuse is distressing, what Norwood did the day he killed Abel — swinging him by the leg and slamming his head into the wall or floor — was different in kind from any of the prior acts of abuse Collins had witnessed.  Viewed in the light most favorable to the judgment, the evidence of Collins's knowledge regarding Norwood's past acts of abuse does not support a reasonable inference that Collins knew Norwood intended to commit life-endangering abuse.  There was certainly a reasonable inference that Collins knew Norwood's care posed a high risk of serious injury to their child.  Such knowledge might be sufficient to find Collins liable for a different crime, such as, for instance, felony child endangerment — an offense "punish[able] by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years" (Pen. Code, § 273a, subd. (a)).  But this knowledge is insufficient to establish Collins is liable for implied malice murder.

---

[6]      The dissent claims we are "credit[ing] Collins's testimony and indulg[ing] in inferences favorable to her." (Dis. opn., *post*, at p. 49.)  However, we premise our holding on the fact that the jury reasonably found, contrary to Collins's testimony, that she witnessed the serious abuse as described to the detectives during her second interview.

While any physical abuse of an infant is cause for significant concern, there is no evidence Collins knew, based on the past acts of abuse, that Norwood intended to inflict life-threatening harm on Abel. Importantly, Collins (and her grandmother) observed no signs of physical injuries prior to the fatal act. Medical testimony established that the fatal act caused injuries — including external ones to Abel's head and leg — that were distinct in nature from injuries caused by Norwood's past acts of abuse — nonfatal internal injuries, mainly rib fractures. When Collins was concerned about Abel's apparent gastrointestinal discomfort, she sought immediate medical attention. No medical personnel observed any signs of trauma or physical abuse at Abel's medical visits, including at the check-up that occurred the day before the fatal injury. At that visit, the nurse saw no signs of bruising, trauma, cuts, or scrapes, and she described Abel as appearing "like a normal two-month baby."[7] Abel's injuries were not visible to the responding

---

[7] The dissent rejects the evidence relating to the physical examination based on its speculation that the jury found this testimony "plainly self-serving, since the nurse could be subject to discipline or criticism for failing to . . . notice an injury on Abel." (Dis. opn., *post*, at p. 30, fn. 6.) "It is well established that '[w]hether a particular inference *can* be drawn from certain evidence is a question of law, but whether the inference *shall* be drawn, in any given case, is a question of fact.'" (*Willis v. Gordon* (1978) 20 Cal.3d 629, 633.) As a matter of law, the inference that the dissent appears to be drawing — that the nurse observed injuries indicative of abuse but did not include them in her report and that Collins was informed of or otherwise aware of such injuries — cannot be drawn. "[W]e cannot . . . venture beyond the evidence presented at trial, and may consider only those inferences that are reasonably supported by the record." (*Ware, supra*, 14 Cal.5th at p. 167.) There is simply

emergency technician and only became apparent once he was at the hospital.  In light of this evidence, there is no reasonable inference that Collins knew Norwood had the intent to commit the fatal act, much less aid him in doing so.[8]

The facts in *People v. Werntz* (2023) 90 Cal.App.5th 1093 and *Stanciel, supra,* 606 N.E.2d 1201 provide useful comparisons to the facts of this case.  In both cases, the parents had a much higher involvement than Collins in the offense of which they were convicted, and both cases generally demonstrate knowledge with a substantial degree of certainty that the perpetrator intended to commit the life-endangering act.  In *Werntz,* the mother was held liable as an aider and abettor for implied malice murder for the death of her ten-week-old daughter.  (*Id.* at pp. 1099–1100.)  The mother's conviction was based, in part, on her failure to seek medical attention for a

---

no evidence in the record the nurse abrogated her duties while repeatedly examining Abel and lied while testifying, much less that Collins was made aware of injuries that were not included in the report.  This inference is improperly premised on mere speculation and guess work.  (*Ibid.* [" ' "[A] reasonable inference . . . 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work' " ' "]; see *Kunkin, supra,* 9 Cal.3d at p. 250; *Anderson, supra,* 70 Cal.2d at p. 24.)

[8]     The dissent reasons that because we can reasonably infer Collins knew that Norwood seriously injured Abel, we can also reasonably infer she knew that Norwood's care was life endangering.  (Dis. opn., *post,* at pp. 4, 27–28 & fn. 4.)  But this reasoning reveals how the now-invalid natural and probable consequences doctrine undergirds the dissent's position.  According to the dissent's logic, if the jury reasonably found Collins knew Norwood committed felony child abuse, it effectively could impute malice.  Murder liability now requires more.  (See Senate Bill No. 1437 (2017–2018 Reg. Sess.).)

serious leg injury the perpetrator inflicted on her daughter which would have caused " 'swelling, redness, [and] puffiness' " that " 'would have been "obvious" to the naked eye.' " (*Id.* at pp. 1100, 1103.) It was also based on Werntz's knowledge that the perpetrator killed Werntz's first child by "brutal means" (*id.* at p. 1117) and by her participation in preventing authorities from ascertaining the cause of her daughter's death. (See *id.* at pp. 1116–1118.) Here, prior to the fatal act, Collins did not observe any physical injuries, Collins made various efforts to secure appropriate medical attention for Abel, there was no evidence Norwood had brutalized other children, and Collins obtained medical care immediately upon observing Abel was in a state of medical emergency.

*Stanciel* involved two consolidated cases. (*Stanciel*, 606 N.E.2d at p. 1209.) In one of the cases, the mother was found liable as an aider and abettor for implied malice murder based, in part, on her knowledge of her three-year-old daughter's extensive, serious injuries and because she herself had left bite marks on her daughter. (*Id.* at p. 1205.) In the other case, the mother was found liable as an aider and abettor for implied malice murder because she knew of her 20-month-old's extensive and serious injuries — including multiple oozing burns on her body and over 45 bruises. (*Id.* at pp. 1206–1207.) Additionally, the defendant in that case was overheard telling her boyfriend, who killed her child, " 'I told you not to get so angry, I told [you] this would happen.' " (*Id.* at p. 1208.) She also shrugged her shoulders when told her son died and acted like his death was inconsequential. (*Ibid.*) Unlike the defendants in *Stanciel*, Collins had no such knowledge or awareness of Abel's injuries, and there was no evidence

28

supporting a reasonable inference that Collins inflicted any injuries herself.

Finally, there is no evidence supporting a reasonable inference that Collins intended to aid Norwood in his commission of the life-endangering act. We find *Glenn v. State* (Ga. 2004) 602 S.E.2d 577 (*Glenn*) instructive. In that case, the mother was convicted of various charges — including felony murder — for the death of her three-week-old daughter. (*Id.* at p. 578.) Several days before the infant's death, the mother noticed a serious injury to her daughter's leg. (*Ibid.*) After waiting, the mother eventually took her daughter to a hospital, and medical staff determined the injury was caused by the infant's leg being forcefully twisted or shaken. (*Ibid.*) There was evidence the mother had been informed that her boyfriend could have caused the injury and that he had committed prior acts of abuse against other children. (*Id.* at p. 580.) Shortly thereafter, the mother left her infant in her boyfriend's care as the mother slept. (*Id.* at p. 579.) The mother awoke to her boyfriend stating her infant was having trouble breathing. (*Ibid.*) The infant was taken to the hospital where it was later determined she had died from blunt force trauma to the head. (*Ibid.*)

In reversing various convictions relating to the child's death, the Georgia Supreme Court held there was insufficient evidence that the mother intentionally aided and abetted her boyfriend's acts that caused her daughter's head injuries. (*Glenn*, *supra*, 602 S.E.2d at p. 580.) The court reasoned the prosecutor did not dispel the theory that the mother was sleeping when her boyfriend committed the fatal abuse against her daughter. (*Ibid.*) The court stressed that intentional aiding

and abetting was required rather than inadvertent or incidental contribution to the offenses.  (*Ibid.*)

Here, the prosecution similarly failed to carry its burden in establishing that Collins intentionally aided and abetted Norwood's commission of the life-endangering act.  The Attorney General argues Collins's intent to aid Norwood can be inferred based on her protecting Norwood during the investigation.  It is true that Collins protected Norwood during her first interview with the police.  She initially claimed the hypodermic needle and drugs were hers when they were Norwood's.  She suggested, at Norwood's direction, that her grandmother may have caused Abel's injuries.  She also stated that Norwood did not abuse her.  During her second interview the next day, Collins disclosed more information relating to Norwood's prior acts of abuse and his behavior the day of the murder in an effort to help the investigation.  Collins's behavior during the first interview was indeed questionable, but given its nature and the point at which it occurred, it does not provide a reasonable inference that Collins intended to aid and abet Norwood's *life-endangering act* prior to or during the commission of that act.

Lastly, we emphasize it is improper to infer a parent's knowledge that another person intends to commit a life-endangering act against their child based on gendered expectations of parenthood.  Here, police questioned Collins about her "mother intuition."  They asked about her "gut" as a mother and remarked how she was "built" with a maternal instinct to protect her child and know what was happening to Abel without direct observation.  Assumptions about what Collins should have done based on outmoded, gendered notions of a mother's — as compared to a father's — role in caring for a child are not proper in determining a mother's liability for

murder based on a failure to protect. (See Anthony, *The Law of Motherhood in the Gender-Dependent Application of Criminal Responsibility for Failing to Protect Children* (2022) 24 Geo. J. Gender & L. 1, 16 [explaining that, based on gender stereotypes, mothers are often held to a higher standard than fathers to protect their children]; Comment, *supra*, 52 U.S.F. L.Rev. at p. 152.) While the statements noted above occurred during the police interrogation, prosecutors and courts must take care to ensure that this type of gender bias does not infect our criminal justice system.

### 2. Actus Reus as an Aider and Abettor

Because we hold there was insufficient evidence that Collins harbored the requisite mens rea, we need not determine whether Collins committed an omission that was sufficient to establish the actus reus required for aiding and abetting implied malice murder. However, in light of the arguments in the trial court and on appeal, we clarify several legal principles regarding the requisite actus reus for second degree murder based on one's failure to act. The principles discussed herein pertain to failure-to-protect criminal prosecutions — a context distinct from dependency or family law.

In the context of aiding and abetting implied malice murder based on a parent's failure to protect, the actus reus could be based on the parent's failure to take reasonable steps necessary to either protect their child from a known, imminent life-endangering act or to stop a life-endangering attack on their child that they know is underway. To meet their burden in demonstrating the steps are reasonable ones, the prosecution must prove that any steps the parent failed to take carry a high probability of preventing or stopping the life-endangering act.

Reasonably possible steps are not theoretical or model ideas of how a parent could have prevented the life-endangering act from occurring. They will vary from case to case and must be informed by the context and circumstances of the particular situation.

In arguing Collins failed to take reasonable steps to protect Abel, the prosecution asserted Collins could have left Norwood by moving out of her grandmother's home and living with other family, could have called the police, or could have reported Norwood to Abel's examining physician. However, as Collins notes, this reasoning effectively resurrects the natural and probable consequences theory of liability by permitting liability for murder based on a parent's failure to protect their child from felony child abuse. Here, the prosecutor's suggestions might be pertinent to a claim that Collins acted with criminal negligence by willfully permitting the abuse of Abel that she knew or should have known was occurring (see *People v. Valdez* (2002) 27 Cal.4th 778 (*Valdez*)), but they do not support a claim that Collins failed to take reasonable steps to protect Abel from the life-endangering act.

Contrary to failing to act in response to Norwood's previous acts of abuse, there was evidence Collins *did* take affirmative and reasonable steps to protect Abel based on the information known to her and in light of her physical state. Collins proactively took Abel to wellness checks and secured medical care for him as needed. As to Norwood's prior abuse of Abel, Collins either physically took Abel away from Norwood or would tell Norwood to stop being physical with Abel when Collins thought Norwood was being too rough with him. On other occasions, Collins told Norwood to leave. On the morning of the life-endangering act, Collins and Norwood got into an

argument about Norwood's drug use and Collins demanded that he move out. Collins took these steps even while in a compromised physical state and reliant upon Norwood, as Abel's father, for practical and financial support.

In evaluating what steps Collins reasonably could have taken to protect Abel, the fact that Norwood was Abel's father was a highly relevant consideration. As discussed *supra*, Norwood had rights and obligations concerning Abel, and the steps Collins would have needed to take to remove Abel from Norwood's care are qualitatively different from those to remove her child from a non-parent's care. Those steps were not fully appreciated or considered by the prosecution in this case.

As noted, there are additional complexities in considering what reasonable steps can be taken for an abused parent to *safely* navigate around or leave an abusive co-parent. Here, it was undisputed that Norwood physically and financially abused Collins and threatened to kill her if she called the police, and Collins knew Norwood had previously been convicted of domestic violence. Indeed, the prosecutor relied on this evidence to show Collins knew Norwood posed a lethal threat to Abel and should have left Norwood to protect Abel. But, as noted, the risk of being killed by one's abuser increases significantly when a victim of intimate partner violence attempts to leave their abuser. (Comment, *supra*, 52 U.S.F. L.Rev. at p. 152 ["a woman's risk of being killed by her abuser increases by seventy-five percent when she leaves her abuser"]; see Jacobs, *supra*, 88 J. Crim. L. & Criminology at p. 581.) This risk of femicide is heightened for postpartum women, such as Collins. (See generally Campbell, Matoff-Stepp, Velez, Hunter Cox & Laughon, *Pregnancy-Associated Deaths from Homicide, Suicide, and Drug Overdose: Review of Research and the Intersection*

*with Intimate Partner Violence* (2021) 30 J. Women's Health 236.) And even short of femicide, leaving a relationship with a child carries a risk of being prosecuted for parental kidnapping. (See generally Cross, *Criminalizing Battered Mothers* (2018) 2018 Utah L.Rev. 259; *id.* at p. 259 ["Not only are survivors with children pressured to leave, they are punished when they stay. . . . Yet a survivor who flees with her children is not immune to these same consequences: if she leaves in a manner that is not state sanctioned, she may be punished criminally or civilly for kidnapping her children, regardless of the violence she was experiencing at home"]; *id.* at p. 262 ["mothers are more likely to be convicted and incarcerated for parental kidnapping than fathers"].)

Instead of recognizing these unfortunate realities of domestic violence, the Attorney General focuses on the fact that Collins did not expressly state that she was afraid to leave Norwood (although she did say she feared him and was afraid of confronting him) and asserting that "Collins prioritized her relationship with Norwood over the safety of her son." But again, the prosecution needed to prove there were steps Collins could have *safely* taken to prohibit Norwood from caring for his son in light of the risk leaving or confronting him (which Collins had done that very morning) posed to Collins and to Abel.

The Attorney General stresses that Collins admitted she should have done a better job in protecting Abel. To be sure, Collins expressed remorse in not taking more immediate and effective action to prevent Abel's death. We would expect any reasonable, caring parent to express remorse that they were unable to prevent their child's death — no matter the cause. At most, Collins's sentiments support a reasonable inference that she recognized, in hindsight, she did not behave as a reasonable

parent. This inference supports a finding that Collins was criminally negligent, as required for felony child endangerment (*Valdez, supra*, 27 Cal.4th at pp. 789–790), but it fails to suffice for a finding she harbored malice.

## C. DIRECT PERPETRATOR THEORY OF LIABILITY

We next address simple implied malice murder. Murder is committed with implied malice when "the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*People v. Knoller* (2007) 41 Cal.4th 139, 143.) To sustain Collins's verdict of second degree murder based on a direct perpetrator theory of liability, there must be sufficient evidence that Collins's failure to protect Abel involved a " 'high degree of probability that it will result in death' " (*id.* at p. 156), that Collins knew her failure to act endangered human life and acted with conscious disregard for life, and that her failure to act proximately caused Abel's death. For malice to be implied, a defendant must be subjectively aware that their acts or omissions endangered the life of their child.

It is true that a reasonable jury could infer that Collins knew to a substantial degree of certainty that Norwood might commit an act of serious, but nonlethal, abuse based on her knowledge of Norwood's state and having witnessed his past acts of abuse. For the reasons discussed above, however, there was insufficient evidence that Collins subjectively appreciated her failure to act was life endangering, because she had no reason to know to any substantial degree of certainty that Norwood would commit a life-endangering act while she

remained on the couch.[9] The abuse Collins witnessed was different in kind from Norwood's fatal act — an act that caused visible external injuries. As discussed above, based upon a physical examination the day before the murder, Abel appeared to be a normal two-month-old. There is no evidence supporting a reasonable inference that Collins was actually aware that her failure to prevent Norwood from going into the back bedroom to change and feed Abel on the afternoon of October 17 endangered Abel's life or that her act of remaining on the couch was in conscious disregard for his life.[10]

---

[9] The dissent mischaracterizes our analysis as "depart[ing] from the established implied malice standard." (Dis. opn., *post*, at p. 23.) The articulation of the requisite mental state — that is, knowing to a substantial degree of certainty that another's life-endangering act is occurring or is about to occur and failing to take reasonable steps to intervene in the face of such an act — reflects the knowledge and conscious disregard for human life requirements in failure-to-protect cases when the defendant has not actually done anything themselves to affirmatively endanger a child in their care. We are applying decades of precedent while clarifying the applicable legal principles in the distinct context of a parental failure-to-protect case. In clarifying the governing law and its application, we in no way call into question established principles of substantial evidence review.

[10] The dissent asserts that "[w]ith a history of abuse severe enough to cause serious injury, a jury could readily infer that allowing Norwood to care for Abel risked life-threatening abuse as well." (Dis opn., *post*, at p. 26.) The dissent erroneously concludes "a reasonable jury could find that Collins knew Norwood's care endangered Abel's life based on the facts known to Collins *prior* to that final act," "[r]egardless of the character of Norwood's final act of abuse." (*Id.* at p. 29.)

The consequences of the dissent's reasoning are far reaching and without precedent. In its view, a parent (or any

The facts of this case stand in stark contrast to other cases in which a parent knew of the danger posed to their child's life and failed to act due to a lack of concern as to whether the victim lived or died. For example, in *Burden, supra,* 72 Cal.App.3d 603, the Court of Appeal affirmed a father's murder conviction under a direct perpetrator theory based on his failure to intervene to protect his five-month-old child. The father was aware the mother was starving their child, the child was clearly malnourished, and the father admitted he could have done

---

other individual with a duty to protect a child) can be held liable for murder if they have witnessed a past act of child abuse and the child is later killed. As relevant here, the dissent fails to appreciate two key facts. First, contrary to the dissent's claims, the record does not support a conclusion that Collins was aware that Norwood had caused serious injury to Abel prior to the fatal act. As discussed, the trial evidence showed that, despite three separate medical visits, a trained medical professional did not observe or diagnose Abel with any injuries prior to the fatal act. Second, and related, the final act of abuse was described by the forensic pathologist as "a markedly violent event" and was distinct in kind from the prior acts of abuse of which the jury could reasonably infer Collins witnessed (i.e., bouncing Abel too hard, covering Abel's mouth to muffle his crying, squeezing him too tight, carelessly bumping his head into furniture, pushing down on his ribcage "probably hard enough to break a rib," and rolling him over by his leg).

And while there may be instances in which a parent does not fulfill their duty to protect by "allowing" an abusive coparent to be alone with the child, we reiterate that gendered expectations of parenting where mothers are responsible for the care of their children and fathers are not, have no place in that assessment. Here, Norwood told Collins he was going to feed and change Abel, and Norwood, as Abel's parent, had an independent responsibility to protect and care for Abel, including ensuring that he was clean and fed. (See *ante,* pp. 16, 30, 33.)

something if he " 'had really wanted to' " but did not do anything because he " 'just didn't care.' " (*Id.* at p. 620.)  The *Burden* court determined the father's awareness of the danger to his child and his indifference to his child's state were sufficient to establish implied malice.  In contrast, Collins took affirmative acts to protect and care for Abel, including taking him to various doctor's appointments, taking Abel away from Norwood when she believed Norwood was being too rough, and telling Norwood to move out the very morning that Abel was killed.  Additionally, after finding Abel in a state of medical emergency, Collins became hysterical and sought medical attention for him immediately.  There was no evidence Collins was subjectively aware of the danger posed to her child's life and failed to act due to a lack of concern as to whether Abel lived or died.

Because there was insufficient evidence of mens rea under a direct perpetrator theory of liability, we need not address the remaining elements of proximate causation and the objective " ' "high degree of probability that it will result in death" ' " element.  (*Reyes, supra,* 14 Cal.5th at p. 989.)

## III.  DISPOSITION

In sum, insufficient evidence supported Collins's second degree murder conviction for the death of her son under either a direct aiding and abetting theory or a direct perpetrator theory.  Accordingly, we reverse the judgment of the Court of Appeal and remand with instructions to direct the trial court to

vacate Collins's conviction for second degree murder and resentence her in accordance with the decision herein.

**EVANS, J.**

**We Concur:**

**LIU, J.**
**GROBAN, J.**
**JENKINS, J.**

PEOPLE v. COLLINS

S279737

Concurring Opinion by Justice Liu

A baby girl, D.M., was born on November 5, 1985 to Loreli and Steven Michael.  (*Michael v. State* (Alaska Ct.App. 1988) 767 P.2d 193, 196 (*Michael*), revd. on other grounds (Alaska 1991) 805 P.2d 371.)  Steven was in the Army and, starting in December, "was out of town on field maneuvers for about two weeks." (*Id.* at p. 196.)  From his return in mid-December until the day D.M. was taken to the hospital, Steven "would on some days spend long hours on duty, but on other days would spend a substantial amount of time at home." (*Ibid.*)

On January 5, 1986, the Michaels brought two-month-old D.M. to the emergency room with a swollen leg. (*Michael*, *supra*, 767 P.2d at p. 196.)  D.M. was diagnosed with "multiple fractures," including "both femurs . . . , the upper and lower bones of both arms, and at least nine ribs," as well as "a bruise on the back of her left shoulder," "two burns on her left forearm," and "broken blood vessels on her face and neck." (*Ibid.*)  Steven and Loreli were each charged with thirteen counts of first degree assault. (*Id.* at p. 195.)

Following a bench trial, the trial court concluded that Loreli "had personally inflicted D.M.'s injuries" and sentenced her to "ten years with three years suspended" on three counts of first degree assault, to be served concurrently. (*Michael*, *supra*, 767 P.2d at p. 195.)  The trial court found Steven guilty of two counts of second degree assault, "a lesser-included offense,"

1

noting that he "had not inflicted the injuries on his daughter and had not acted as an accomplice to [his wife's] infliction of D.M.'s injuries." (*Id.* at p. 196.) The court sentenced him to four years in prison for breaching his parental duty to assist D.M. "when he knew that she was physically mistreated and abused by his wife." (*Id.* at pp. 196–197.)

Although the trial court found it was Loreli, not Steven, who "personally assaulted D.M." (*Michael*, *supra*, 767 P.2d at p. 202), the evidence nonetheless appeared sufficient to convict Steven of first degree assault on the theory that he "knowingly engage[d] in conduct that result[ed] in serious physical injury to another under circumstances manifesting extreme indifference to the value of human life." (Alaska Stat., § 11.41.200(a)(3); see *Michael*, at p. 195.) The trial court found that "Michael knew of the need to take action to protect his daughter" (*Michael*, at p. 200); his failure to protect D.M. was "conduct" (*id.* at pp. 197, 200); D.M.'s serious injuries were "a result of" his conduct (*id.* at p. 197); and his failure to protect a two-month-old infant from repeated abuse resulting in thirteen broken bones, a bruise, burns, and broken blood vessels would reasonably seem to "manifest[] extreme indifference to the value of human life" (Alaska Stat., § 11.41.200(a)(3)). (See *Michael*, at p. 203 ["Taking the evidence in the light most favorable to the state, someone who was living in the same household as D.M. would have known well before D.M. was taken to the hospital . . . that D.M. had been severely injured on previous occasions. In addition, Michael's statements and actions after his daughter went to the hospital support the inference that he knew that his wife was deliberately injuring D.M."].)

It is understandable that the trial court in *Michael* tempered the father's punishment to account for his absences

and lack of personal involvement in the abuse. (*Michael*, *supra*, 767 P.2d at pp. 195–196, 201.) Yet this impulse to moderate punishment for harms that a parent did not personally inflict is not extended equally to mothers. (Anthony, *The Law of Motherhood in the Gender-Dependent Application of Criminal Responsibility for Failing to Protect Children* (2022) 24 Geo. J. Gender & L. 1, 3 (Anthony).) "Broad investigations of cases involving prosecution of the non-abusing parent under failure to protect laws reveal[] that . . . the prosecuted parent is nearly always the mother." (*Id.* at p. 13.) And even in the "uncommon instances where fathers are charged for failure to protect, they are more likely to be charged with lesser offenses." (*Id.* at p. 16; see Purvis, *The Rules of Maternity* (2017) 84 Tenn. L.Rev. 367, 404 [noting the "almost complete absence of fathers charged with a failure to protect their child" even though "by raw numbers alone, parents witnessing abuse by their co-parent . . . are *fathers*, and not mothers"].) *Michael* involved the conviction of a father on a lesser charge; we do not know how many fathers who witness abuse of their child are never convicted or charged at all.

I am aware of one statewide study of the disparate application of failure-to-protect laws, and that study shows stark gender disparities. (ACLU Oklahoma, Oklahoma's Failure to Protect Law and the Criminalization of Motherhood (2020) <https://www.acluok.org/en/publications/oklahomas-failure-protect-law-and-criminalization-motherhood> [as of Jan. 6, 2025] (ACLU Oklahoma); all Internet citations in this opinion are archived by year, docket number, and case name at <https://courts.ca.gov/opinions/cited-supreme-court-opinions>.) Oklahoma enforces failure-to-protect liability by statute: "Any person responsible for the health, safety or welfare of a child

who shall willfully or maliciously engage in enabling child abuse" may be convicted and sentenced to a term up to life imprisonment. (Okla. Stat. tit. 21, § 843.5(B).) The phrase " 'enabling child abuse' " means "failure to protect from harm or threatened harm to the health, safety or welfare of a child under eighteen . . . years of age by a person responsible for a child's health, safety or welfare." (*Id.*, § 843.5(O)(1)(a).) The study found that between 2009 and 2018, "women make up 93 percent of people convicted of failure to protect in Oklahoma. In the three percent of cases where a man is convicted of failure to protect, so was their female partner, because the prosecution simply did not identify the person committing the abuse and charged both caregivers with failure to protect. There were zero cases where a woman was convicted of child abuse and her male partner was convicted of failure to protect." (ACLU Oklahoma.) In addition, one in four women convicted under the failure-to-protect statute received a longer sentence than the person who actually committed the abuse. (*Ibid.*) And at least half of the women convicted under the statute were themselves abused by the man harming their children. (*Ibid.*)

I do not know of any comparable statewide data on the prosecution of parents in California under failure-to-protect theories. But a recent survey of 649 women representing 58.2 percent of women incarcerated in California for murder or manslaughter suggests that California is not immune from such gender disparities. (Stanford Criminal Justice Center, Fatal Peril: Unheard Stories From the IPV-to-Prison Pipeline and Other Voices Touched by Violence (2024) <https://law.stanford.edu/wp-content/uploads/2024/08/Fatal-Peril-Final.pdf> [as of Jan. 6, 2025] (Fatal Peril).) One respondent was away at work when her child was killed by an abusive male

partner. (*Id.* at p. 106.) It does not appear she received leniency on account of her absence and lack of involvement, as the father did in *Michael*; she is presently serving a life sentence. (*Ibid.*) In her words: "My partner was really abusive and controlling. He would keep my son hostage in order to control me, besides threatening me and hurting me. . . . The abuse increased a lot during a small period of time until the fatal day that he was so high he killed my [child] while I was working. . . . My [child] was [a toddler] and I [am] the one receiving a life sentence for what he did." (*Ibid.*) Another respondent whose male partner killed her daughter reported that the man is now free after being convicted as "an accessory after the fact" while she is serving a "lengthy indeterminate sentence." (*Id.* at p. 105.) Many respondents were themselves victims of their partner's violence; two women reported having been beaten unconscious when their children were dealt the fatal blow. (*Id.* at pp. 106–107.)

I join today's opinion finding insufficient evidence to convict defendant Brittney Collins of second degree murder for the death of her son Abel at the hands of his father. (Maj. opn., *ante*, at p. 1.) I also agree that "a parent's failure to act can constitute an affirmative act for the purposes of criminal liability in some situations." (*Id.* at p. 14.) I write to express concern that failure-to-act liability carries a significant risk of unfairly punishing women who do not live up to gendered and class-based expectations of motherhood. In many ways, our society valorizes motherhood, but it also comes down hard on "bad mothers." An awareness of this potential bias, as with any bias, properly informs our review of this case.

Much of the disagreement over this case turns on views about what a "reasonable parent" in Collins's situation would have done. (Dis. opn., *post*, at pp. 3, 41–43.) Although the

"reasonable parent" standard is the law, it is vital to acknowledge that the concept is highly susceptible to gender and class biases. (See Anthony, *supra*, 24 Geo. J. Gender & L. at p. 3 ["[I]n practice, 'reasonable' appears to mean something quite different for mothers than it does for fathers."].) For example, do unwarranted expectations of a mother's "intuitive" awareness of danger to her child inform the analysis of Collins's knowledge of Abel's risk of death? (See Trozzo, *Victim Blaming: Failure to Protect Laws as a Legislative Attack on Mothers* (2021) 23 Geo. J. Gender & L. 79, 99 ["Mothers are presumed to intuitively know about abuse of their children, even if they never witness the abuse."].) The risk of such bias is especially significant when it comes to children suffering harm from male partners, as in this case. (See Anthony, at p. 22 ["[T]he avoidance of risk to a mother's children is an element of idealized motherhood, where the responsibility is not only to care for children, but also to 'avoid and manage male violence.' When harm befalls children at the hands of men, it signifies a failure of the mother to predict, manage, and stop that violence."], fn. omitted.) These gender biases are not theoretical; in this case, detectives repeatedly asked Collins what her " 'mother intuition [*sic*]' " and " 'gut as a mother' " were telling her about what happened to Abel. (Maj. opn., *ante*, at pp. 5–6.)

Also, one might question whether inferences of Collins's culpability are refracted through a lens that sees Abel's mother as his "natural" caregiver. (See *Nevada Dept. of Human Resources v. Hibbs* (2003) 538 U.S. 721, 736 [discussing "mutually reinforcing stereotypes" that women play "the role of primary family caregiver" while men "lack . . . domestic responsibilities"]; Panko, *Legal Backlash: The Expanding Liability of Women Who Fail to Protect Their Children* (1995) 6

Hastings Women's L.J. 67, 75 ["Within the nuclear family, it is still considered natural that mothers have a special bond with their children while fathers remain distant . . . ."], fn. omitted; Ginsburg, *Constitutional Adjudication in the United States as a Means of Advancing the Equal Stature of Men and Women Under the Law* (1997) 26 Hofstra L.Rev. 263, 266, 270.) It is difficult to imagine framing Collins as "allowing Norwood to care for Abel" (dis. opn., *post*, at p. 4) had the parents' genders been reversed; fathers are not said to "allow" their children to be cared for by their mothers. (See, e.g., *Michael*, *supra*, 767 P.2d 193 [not once describing the circumstances in terms of the father "allowing" his wife to care for their daughter, even though the father knew his wife had been severely abusing her].)

The risk of bias is that Norwood's care for his son is viewed as a replacement for caregiving that Collins should have been doing. (See Garcia, *The Gender Bind: Men as Inauthentic Caregivers* (2013) 20 Duke J. Gender L. & Policy 1, 4 ["Often society sees men as 'babysitting' their own children and men must prove that they are actually providing care to be labeled caregivers. Otherwise, their care only replaces the care that the mother would otherwise be giving."], fn. omitted.) This view was expressed by the detectives who told Collins: " '[M]om's the person that watches the kid. Mom's the person that takes care of the baby. Mom's the person that protects their baby. Right?' " (Maj. opn., *ante*, at p. 5.)

Further, we might ask what socioeconomic assumptions inform analysis of the options reasonably available to Collins to remove Abel from his father. The dissenting opinion says the jury could have found that "a reasonable parent could and would have" forced Norwood to leave or "could and would have" left with Abel to escape Norwood. (Dis. opn., *post*, at pp. 42–43.)

7

The dissent acknowledges that Collins would have also needed to relocate her grandmother and says there was evidence that her grandmother could have stayed with family or friends before Abel's death.  (*Id*. at p. 43.)

Would it have been reasonable for the jury to have drawn these conclusions?  In assessing the sufficiency of the evidence, I see nothing speculative about considering the reality that "financial dependence on a partner is a barrier for women of lower socioeconomic status who may not have the means to leave."  (Fatal Peril*, supra,* at p. 26; see Buel, *Fifty Obstacles to Leaving, a.k.a., Why Abuse Victims Stay* (1999) 28 Colo. L. 19, 20 (Buel) ["the number one reason cited [by victims of domestic violence] for returning to the batterer [was] financial despair" because the women were unable to provide for themselves or their children without the batterer's assistance].)  Again, the concern is not theoretical:  "Collins . . . reported that Norwood overdrew all of her bank accounts and that, consequently, she no longer had her own bank accounts."  (Maj. opn., *ante*, at p. 8; see Buel, at p. 20 ["Financial abuse is a common tactic of abusers."].)  On the day of Abel's death, Collins was applying for jobs in an apparent attempt to gain financial independence from Norwood that simply came too late.  (Maj. opn., *ante*, at p. 10.)

Would it have been reasonable for the jury to have concluded that Collins had the support of friends or family willing and able to shoulder the burden of housing two additional adults and an infant?  The evidence seems awfully thin.  (Maj. opn., *ante*, at p. 7, fn. 2; compare dis. opn., *post*, at p. 43 with *People v. Marshall* (1997) 15 Cal.4th 1, 34 ["The supporting evidence [on sufficiency review] must be substantial, that is, 'evidence that "reasonably inspires confidence and is of 'solid value.' " ' "].)  It requires no speculation, in reviewing this

record, to consider the reality that women of limited financial means often "do not have a safe place to go at which their abuser cannot reach them," and family and friends "may be reluctant to invite the abused family into their own home, fearing for their own safety." (Mahoney, *How Failure to Protect Laws Punish the Vulnerable* (2019) 29 Health Matrix 429, 445 (Mahoney).) The social isolation of women in abusive relationships is "typical," as the batterer gradually "cut[s] the victim off from family, friends, and colleagues," leaving women "without safety plans and reality checks." (Buel, *supra*, 28 Colo. L. at p. 22; see Fatal Peril, *supra*, at p. 76 ["isolation is an emotional abuse tactic often used to exert control and maintain power"].)

Finally, domestic violence presents "additional complexities in considering what reasonable steps can be taken for an abused parent to safely navigate around or leave an abusive co-parent." (Maj. opn., *ante*, at p. 33; see *ibid.* ["the risk of being killed by one's abuser increases significantly when a victim of intimate partner violence attempts to leave their abuser" and "[t]his risk of femicide is heightened for postpartum women, such as Collins"].) Given those complexities, I find it a stretch to say the jury could have concluded beyond a reasonable doubt that Collins acted with implied malice toward Abel or proximately caused his death "because she valued her relationship with Norwood more than she valued Abel's well-being." (Dis. opn., *post*, at p. 39; see *id.* at pp. 5, 33–34.) To say that Collins, who was unsafe and financially strapped, "prioritized" her relationship with her abuser (*id.* at p. 33) presumes a degree of volition that is not supported by "evidence which is reasonable, credible, and of solid value" (*People v. Johnson* (1980) 26 Cal.3d 557, 578).

The dissent contends that facts about the inability of women who are victims of domestic violence to leave their abusers were "not before the jury" and are thus "irrelevant to our substantial evidence review." (Dis. opn., *post*, at p. 44, fn. 11.) Appellate review for sufficiency of the evidence, the dissent says, " 'is limited to considering the evidence actually presented to the jury.' " (*Id.* at p. 45, fn. 11.) No one disagrees with this hornbook rule. (Maj. opn., *ante*, at p. 7, fn. 2.) But substantial evidence review requires us to determine what inferences from the evidence are "reasonable," and what is "reasonable" is a legal question informed by "[c]ommon sense . . . and an appropriate sensitivity to social context." (*Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 82.) This is no less true here than in other contexts. (See, e.g., *id.* at p. 81 [severity of workplace harassment is "judged from the perspective of a reasonable person in the plaintiff's position" and "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target"]; *People v. Flores* (2024) 15 Cal.5th 1032, 1044–1046 [making numerous sociological and behavioral observations, without citation to evidence, about what conduct is " 'odd,' " "ordinary," "noteworthy," or a "deviation from perceived social convention" when a person is approached by police]; *id.* at p. 1049 [noting in dicta that courts have taken into account a racial "group's experience with law enforcement . . . in evaluating the objective reasonableness of any asserted suspicion of criminality"].)

The dissent ultimately concedes that "[t]he severe burdens suffered by victims of domestic or intimate partner violence are widely known" and "may be considered . . . by a reviewing court," but says it is improper to consider the studies that have made those burdens widely known. (Dis. opn., *post*, at p. 44, fn. 11.)

The dissent cites no authority for this view, and case law supports the unremarkable proposition that reviewing courts need not and should not ignore either widely known facts or their empirical bases. (See, e.g., *Miller v. Alabama* (2012) 567 U.S. 460, 471 [relying on "what 'any parent knows,' " backed up by "science and social science," in explicating the diminished culpability of juveniles].) Indeed, venerable precedents of this court have done exactly what the dissent would disallow here. (See *Perez v. Sharp* (1948) 32 Cal.2d 711, 723–724 & fn. 6 [striking down California's anti-miscegenation laws and citing numerous empirical studies in discussing the "considerable reevaluation by social and physical scientists in the past two decades" of data purporting to correlate race and intelligence]; *Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1, 19–20 & fns. 19–20 [citing numerous empirical studies in documenting "legal and social disabilities" facing women and concluding that "sexual classifications are properly treated as suspect"].) The studies in *Perez* and *Sail'er Inn* were not cited in any briefing before this court and by all indications were "raised for the first time by the court or its members." (Dis. opn., *post*, at p. 44, fn. 11.) The dissent says those cases are "not analogous" (*ibid.*) but does not explain why courts may consider social science that underlies general knowledge in deciding some constitutional questions but not in deciding the due process issue here.

The reality is that intimate partner violence is a "common" occurrence affecting the parental relationships in which children are raised. (Centers for Disease Control and Prevention, Preventing Intimate Partner Violence (2022) <https://stacks.cdc.gov/view/cdc/124386/cdc_124386_DS1.pdf> [as of Jan. 6, 2025].) About one in three women report having experienced severe physical violence from an intimate partner

in their lifetime. (*Ibid.*) Such violence constrains a parent's options and ability to protect her child, and it is appropriate to consider this social context in assessing what conclusions a jury can reasonably draw from the evidence. And the fact that Collins was not a "perfect victim" is no reason to diminish the abuse and fear she endured. (See Meadows & Goodmark, *Discretion and Credibility, Dignity and Mercy:  The Case of PT, A Criminalized Survivor* (2023) 38 Wis. J.L. Gender & Society 53, 54 ["Survivors who are 'imperfect victims' — who fail to conform to victim stereotypes that cast victims of intimate partner violence as weak, passive, white, straight, middle class, and morally upright — are often deemed not credible or not worthy of mercy and compassion by prosecutors, courts, and parole boards."].)

To be clear, I do not contend that Collins bears no culpability for Abel's tragic death. Collins may well have been guilty of a crime, such as felony child endangerment, an offense punishable by up to six years in prison. (Pen. Code, § 273a, subd. (a); see maj. opn., *ante*, at p. 35.) However, for the reasons above and in today's opinion, I agree that Collins's second degree murder conviction is not supported by substantial evidence.

**LIU, J.**

**We Concur:**

**GROBAN, J.**
**EVANS, J.**

PEOPLE v. COLLINS

S279737


Concurring Opinion by Justice Kruger


I concur in the judgment and in parts I., II.A., II.B.1., II.C., and III.

**KRUGER, J.**

PEOPLE v. COLLINS

S279737

Dissenting Opinion by Chief Justice Guerrero

The majority characterizes this matter as a "close case" (maj. opn., *ante*, at p. 1), and it may have been — for the jury. The jury was tasked with sorting through the medical evidence, understanding the circumstances of two-month-old Abel's death, determining what defendant Brittney Collins knew about Matthew Norwood's abuse, and ultimately making its best judgment about Collins's ability to protect Abel from further abuse and about her state of mind when she failed to do so. But when the jury's verdict is challenged for lack of evidence, what might appear to be a close case for the jury is a straightforward case on appeal.

An appellate court does not " 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318–319 (*Jackson*); accord, *People v. Mumin* (2023) 15 Cal.5th 176, 198 (*Mumin*).)

1

The majority fails to observe this distinction. In reversing the judgment, the majority credits evidence the jury could reasonably disbelieve, it resolves conflicts in the evidence the jury could reasonably have resolved differently, and it reweighs the evidence and draws inferences in favor of Collins rather than the opposite. For example, the majority makes much of the fact that a nurse practitioner testified she examined Abel the day before Norwood's fatal abuse and she did not see any signs of external injury. (Maj. opn., *ante*, at pp. 2–3, 9, 26–27, 36.) But the jury could reasonably have attributed little if any weight to this testimony in determining Collins's mental state. It was contradicted by Collins's statements to police that the nurse did in fact recognize an injury: Abel's swollen leg. It was also contrary to Collins's own direct knowledge of Norwood's repeated and brutal abuse of Abel, including crushing Abel's infant body with enough force to break multiple ribs. In fact, the undisputed medical evidence showed that Abel had already suffered numerous rib fractures and other internal injuries at the time of the examination. The nurse practitioner did not know to look for such injuries because Collins kept silent about Abel's suffering. The nurse practitioner's testimony did not require the jury to ignore other compelling evidence of Collins's awareness of the severity of Norwood's abuse.

Contrary to the majority's position, when viewed through the lens of the correct standard of review, the jury's verdict is amply supported by the evidence. The majority focuses on the alternate theory of aiding and abetting, but the prosecution's primary theory at trial was Collins's liability as a direct perpetrator of implied malice murder. The basic substantive elements of that crime are — or should be — undisputed: A defendant is liable for implied malice murder as a direct

perpetrator "when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).) Although the majority wrongly grafts an additional element onto this established standard, it is clear that a reasonable jury could find each *Reyes* element beyond a reasonable doubt based on the evidence presented at trial.

We have long recognized that the breach of a parental duty of care may supply the act necessary for criminal liability, including for murder. (*People v. Heitzman* (1994) 9 Cal.4th 189, 198 (*Heitzman*).) As the majority confirms, a parent breaches this duty of care when the parent fails to take every step reasonably necessary under the circumstances to protect his or her child from harm. (Maj. opn., *ante*, at p. 14.) The jury here could reasonably find that Collins did not take every reasonably necessary step to protect Abel. Given the magnitude of the threat facing Abel — discussed below — a reasonable parent in Collins's situation would not have allowed Norwood to care for Abel while he was abusing methamphetamine. A reasonable parent would have either cared for Abel herself, forced Norwood to leave, or left Norwood and taken Abel with her. Further, the jury could reasonably find that Collins's failure to protect Abel proximately caused his death: Abel would not have died if Collins had acted as a reasonable parent and taken all reasonably necessary steps to protect him.

The jury could also reasonably find that the natural consequences of Collins's failure to protect Abel from Norwood were dangerous to Abel's life. Indeed, defense counsel conceded

this element at trial. This concession was well taken. The evidence showed that Norwood was skeptical that Abel was his son, he threatened Abel's life before he was born, he brutally assaulted Collins while she was pregnant, and he repeatedly and severely abused Abel during his short life. Norwood was more likely to act violently and abuse Abel when using methamphetamine, and Norwood was high and angry and violent on the day of the fatal attack. Based on Abel's vulnerable state, Norwood's lethal threats, and the severe abuse he had already inflicted, Norwood's care involved a high degree of probability of Abel's death — which, tragically, did in fact occur.

It was likewise reasonable for the jury to find that Collins knew her failure to protect Abel endangered his life. Collins knew all of the facts that made Norwood's care so dangerous: his drug use, his violence, his threats, and his brutal and repeated abuse of Abel. Collins admitted she saw Norwood shaking Abel, choking him, smacking him, "bounc[ing]" him, "thump[ing]" him, and crushing his body with such force that Collins knew Abel could fracture a rib. In her briefing, Collins acknowledges that she admitted to police "that she knew Norwood had previously assaulted Abel enough to cause serious injury." Collins also knew Abel was a fragile and vulnerable infant. She had been specifically informed following Abel's birth that shaking or squeezing him too hard risked serious injury or death. This evidence is more than sufficient to support the jury's finding that Collins knew that allowing Norwood to care for Abel not only risked serious injury, as she admitted, but endangered Abel's life as well.

The same facts suffice to support the jury's finding that Collins acted with conscious disregard for life, since Collins failed to protect Abel notwithstanding her knowledge of the risk

presented by Norwood's care. But Collins's actions after the fatal attack provide additional support. After Norwood's final act of abuse — which caused a loud bang with no crying afterward — Collins did not check on Abel for over an hour, even after Norwood left their home oddly and in a hurry. Although Collins was distraught by Abel's condition, and she immediately suspected Norwood, she acted to protect *Norwood* rather than assist medical professionals or the police investigating Abel's injuries. When Collins and Norwood faced questioning, Collins told Norwood she would not "throw [him] under the bus," she lied to detectives and doctors about Norwood's abuse, and she callously suggested her elderly and infirm grandmother was responsible for Abel's death. A reasonable jury could view Collins's efforts to protect Norwood as confirmation of her disregard for the risk Norwood posed to Abel's life. For Collins, Norwood came first, even if it meant risking Abel's life to maintain her relationship with him.

Because the evidence supports Collins's liability for implied malice murder based on her own failure to protect Abel, and no other error appears, it is unnecessary to address whether Collins would also be liable as a direct aider and abettor. (*People v. Ghobrial* (2018) 5 Cal.5th 250, 278 (*Ghobrial*).) The judgment against Collins should be affirmed, and I respectfully dissent from the majority's contrary conclusion.

## I. STANDARD OF REVIEW

In a potentially close case, it is all the more important to faithfully apply the standard of review. When the jury's verdict is attacked for lack of evidence, the standard of review is not a mere academic matter. It respects the essential role and responsibility of the jury to determine which evidence to believe

and to decide which reasonable inferences based on the evidence should be credited. (*Jackson*, *supra*, 443 U.S. at p. 319.) For an appellate court to "resolve conflicts in the evidence and weigh the testimony of witnesses" would be " 'a clear usurpation of the jury's exclusive function.' " (*Mumin*, *supra*, 15 Cal.5th at p. 202.) Twelve jurors heard the evidence, watched Collins and Norwood testify, and deliberated among themselves to reach their verdict. The standard of review ensures their view of the evidence is given due deference. We will reverse only in extreme cases, where the jury acted unreasonably or irrationally, and its view of the evidence finds no reasonable support in the record.

The majority provides a basic statement of the standard: "In considering a sufficiency of the evidence claim, we review 'the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (Maj. opn., *ante*, at p. 12, quoting *People v. Johnson* (1980) 26 Cal.3d 557, 578.) The majority also properly cautions against relying on suspicion, surmise, or conjecture. (Maj. opn., *ante*, at pp. 12–13.) But, other than viewing the record in the light most favorable to the judgment, the majority says little about how our role on appeal differs from the jury's role.

Under the law, our role differs from the jury's role quite significantly. " ' "We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." ' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.) " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge [in a court trial] or jury to determine the

credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*Mumin, supra,* 15 Cal.5th at p. 202.)

These principles lead to an especially limited role where the prosecution relies on circumstantial evidence, such as to prove a defendant's state of mind. " 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) " 'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.' [Citations.] 'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 713 (*Westerfield*).) " ' " ' " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " ' " ' " (*Ghobrial, supra,* 5 Cal.5th at p. 278.) "As we recognized long ago, '[i]t may be confidently declared that, founded upon the evidence, the jury not only is authorized to make any logical and reasonable deduction, but also that the jury is the exclusive judge of the weight and value of the inference that may be drawn by it . . . .' " (*Mumin, supra,* 15 Cal.5th at p. 202.)

Significantly, under the standard of review, an appellate court must set aside its own view of the strength or believability of the evidence. For example, the appellate court cannot reject evidence the jury could reasonably have credited. " ' "To warrant the rejection of the statements given by a witness who has been believed by a trial court [or jury], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions." ' " (*People v. Maciel* (2013) 57 Cal.4th 482, 519.) Moreover, the appellate court cannot credit evidence — even uncontroverted evidence — that the jury could reasonably have rejected. "The jury . . . is the sole judge of the credibility of the witnesses [citations] and is free to disbelieve them even though they are uncontradicted if there is any rational ground for doing so." (*Blank v. Coffin* (1942) 20 Cal.2d 457, 461; accord, *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1044.)

Indeed, as we recently confirmed, "It is well settled that the jury has wide latitude to believe or disbelieve witnesses, or even specific portions of their testimony, as it sees fit. ' "[T]he jury properly may reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material." ' " (*In re Lopez* (2023) 14 Cal.5th 562, 591 (*Lopez*).)

The majority fails to describe these principles and, more importantly, fails to apply them in its assessment of the jury's verdict. As explained further below, the majority's flawed conclusion is directly attributable to these errors.

## II.  STATE OF THE EVIDENCE

In its factual and procedural background, the majority begins by synthesizing the evidence into a coherent story.  (Maj. opn., *ante*, at pp. 1–5.)  In relating the circumstances of Collins's pregnancy and Abel's death, the majority does not describe the specific testimony or physical evidence as it was formally presented at trial, e.g., via the testimony of a police detective, Collins's interview with police, or medical records.  Although I have no quarrel with this approach as a general matter, such a synthesis must be carefully drafted to ensure it conforms to the principles of substantial evidence review described above.  For example, it must describe the facts in the light most favorable to the jury's verdict, and it cannot accept as true evidence or inferences the jury did not have to believe.  Otherwise, the synthesis may reflect the reviewing court's own view of the evidence and the inferences to be drawn therefrom, rather than the evidence and inferences a reasonable jury could have believed in reaching its verdict.

The synthesis offered by the majority falls on the wrong side of this divide.  It consistently credits exculpatory evidence — primarily Collins's own testimony — while omitting or minimizing evidence and reasonable inferences that support Collins's guilt.  For example, the majority accepts as true Collins's testimony at trial that she demanded Norwood move out the morning of the fatal attack on Abel (and that Norwood was actually doing so).  But the jury did not have to believe this testimony.  Collins did not mention this fact in her interviews with police, and Norwood denied it.

Following its synthesis, the majority summarizes Collins's interviews with police and her testimony at trial, along with

other evidence before the jury. But this summary, too, is skewed in favor of Collins. Its labored justification for failing to acknowledge that Collins saw Norwood "choke" Abel — despite Collins's statement to police that what she saw " 'doesn't look like choking, *it was choking*' " — is illustrative. (Maj. opn., *ante*, at p. 7, fn. 2, italics added.) The summary also omits numerous facts regarding Norwood's conduct and Collins's knowledge that the jury could reasonably have credited in reaching its verdict.

The majority's factual background is therefore inadequate to assess the evidentiary support for the jury's verdict. It obscures rather than illuminates the factual findings and reasonable inferences the jury could draw from the evidentiary record. I offer the following corrective below, viewing the record in the light most favorable to the judgment and summarizing the key facts a reasonable jury could credit. This summary shows how a reasonable jury could have convicted Collins of implied malice murder, and why the jury's verdict should not be overturned by a reviewing court for lack of evidence.

The evidence showed that Norwood was a daily methamphetamine user who was mean, angry, and violent, especially when under the influence. The majority acknowledges Collins used methamphetamine as well, though it emphasizes her claim that she stopped using while she was pregnant. (Maj. opn., *ante*, at p. 1.) The majority elides the fact that a reasonable jury could find that her abstention was at best only temporary. Collins told police she used methamphetamine at least once *after* Abel was born.

Norwood and Collins were in a relationship when Collins became pregnant, but Norwood did not believe Abel was his biological son — another fact the majority omits. Collins

10

testified that Norwood brought it up "quite a few times" and "would say Abel wasn't his." Collins said that neighbors told Norwood that Abel was not his son, and even a family member agreed.

Norwood stated multiple times he did not want to be a father and he wished Collins were not pregnant. Once, when he said he did not "want to be a dad," he "jabb[ed]" at Collins's pregnant stomach with a screwdriver, causing Collins to "[take] off running" and profess that she wanted to keep the baby. When Collins was eight or nine months pregnant, Norwood told her he "would make sure Abel wasn't born, like try to make [her] lose him." Norwood told a neighbor of his intent to kill Abel as well, stating "I don't want that fucking baby. She should abort the goddamn baby. I don't want to be a damn dad. We should kill that baby." The jury could reasonably find Norwood's malicious statements especially significant because they occurred at such a late stage in Collins's pregnancy.

Norwood assaulted Collins while she was pregnant, including acts specifically directed at Abel. Norwood choked Collins, pushed her down, and kneed her in the stomach. Collins admitted to police she knew Norwood was trying to make her lose Abel.

Collins told police and testified she had a difficult pregnancy, though the jury did not have to believe she "nearly died during childbirth," as the majority asserts. (Maj. opn., *ante*, at p. 2.) The jury could readily conclude, however, that Abel struggled mightily: He was admitted at birth into a neonatal intensive care unit (NICU) with meconium aspiration and an infection. Abel remained in the NICU for about a week.

At home, after Abel's discharge, Norwood was angry and physically abusive toward the newborn, consistent with Norwood's prior threats and violence. Collins told police Norwood would "get mad" at normal behavior like Abel "not go[ing] to sleep" or crying "too long." Norwood would be really agitated and upset, "more than . . . you should be at a baby." Although the majority tries to minimize Norwood's abuse, Collins told police she saw Norwood "smack[]" Abel, shake him back and forth, hit his head on furniture, "chok[e]" him, and "bounce" him too hard. She saw Norwood cover Abel's mouth repeatedly to keep him from crying. Collins saw Norwood grab Abel's leg too hard and flip him over. Collins told police Norwood would "roll [Abel] over by his leg" all the time. Indeed, Collins said she noticed Abel's leg was swollen the day before Norwood's fatal abuse.[1]

Once, Collins walked in and saw Norwood with his hand raised, about to hit Abel in the head. Collins said, "It looked like he could've been hitting him." Abel's eyes "were really red" and "swollen." Later, Collins told police, "[E]ven though I haven't seen [Norwood] physically hit [Abel], I know he did it because of all those small things."

Most seriously, Collins admitted she witnessed Norwood push down on Abel's chest with enough force to break his ribs, while shaking Abel's head back and forth. Abel was screaming

---

[1] Collins told police she mentioned to the nurse practitioner that Abel's leg was swollen. She said the nurse agreed it was swollen and asked Collins to bring Abel back if it got worse. Collins's statements provide an additional reason why a reasonable jury could give the nurse practitioner's trial testimony — which did not mention Abel's swollen leg — little or no weight. (See fn. 6, *post*.)

and crying. Medical scans later confirmed that Norwood's abuse had caused Abel to fracture seven ribs. At trial, a doctor testified that these rib fractures "are very clearly associated with violent shaking of an infant" and "extreme chest compressions most often during an extremely violent shaking process to the infant, such that the ribs snap along the back near the spine."

During the week or two prior to Norwood's fatal abuse, Collins heard five to six loud "thumps" when Norwood was caring for Abel alone. It sounded like something "smack into" something else. After each thump, Abel would scream or cry even louder. Collins said she asked Norwood for an explanation, but she admitted she knew at the time his explanations did not make sense.

On the day of the fatal abuse, Norwood was high on methamphetamine. Collins saw Norwood use methamphetamine that morning, as well as the day before and likely the day before that. At trial, Collins testified that she and Norwood had argued that morning, and Norwood had become violent, breaking her phone. Collins's grandmother testified she was scared of Norwood that day.

Collins knew Abel was fussier than normal since he had received several vaccinations the day before. While Collins was on the couch, Norwood insisted that he care for Abel and give him his bottle. Collins told police that it was "weird" that Norwood "wanted to take care of him so much" because Collins normally cared for Abel. At trial, Collins admitted she knew Norwood was still high on methamphetamine, but Collins allowed him to take Abel anyway.

Norwood carried Abel into his room, and Collins heard a "loud bang" similar to other times when Norwood took care of (and abused) Abel. This time, however, Abel did not make any sound afterward. Collins told police, "All the sudden, he's just quiet even though I hear a loud bang? That's not normal." Collins said that Norwood left afterward, "real antsy" and in a hurry.[2] But Collins remained on the couch. She only checked on Abel an hour later, and she then found him in acute distress. Collins picked Abel up and ran to her grandmother and then to a neighbor's house. When an ambulance arrived, Collins "changed [clothes] really fast and [she] went into the ambulance" with a paramedic.

After they arrived at the hospital, medical personnel quickly found evidence that Abel had been seriously abused. As the majority explains, police searched Collins's grandmother's house, and they recorded a conversation between Norwood and Collins in a police car while they waited. (Maj. opn., *ante*, at p. 5.) During the conversation, Norwood told Collins he loved her and said, "Just making sure you know that. I'd never do anything to throw you under the bus or anything like that." Collins responded, "Babe, I'm not gonna throw you under the bus." Later, Norwood said, "I know you're scared baby but no matter what, I love you. They're trying to get me for this not you." Collins replied, "There's nothing to be scared about. We didn't do anything."

---

[2] Collins told police she thought Norwood was going to Home Depot, but a friend testified at trial that Norwood met with him to try to get more methamphetamine. They were not successful, and Collins called Norwood later when she discovered Abel's condition.

Collins was interviewed several times by police. During her first interview, after being told about Abel's injuries, Collins claimed that Norwood had never harmed her or Abel. She said Norwood "even apologizes when he steps on your toe on accident." Collins told police Norwood was never verbally abusive either, and she denied that Norwood ever said anything negative about Abel. Collins took responsibility for a syringe found at her grandmother's house, and she told a long and elaborate story about how she used it to inject methamphetamine with some friends.

Collins repeatedly suggested to police that her grandmother might have dropped Abel and been responsible for his injuries. Collins said her grandmother had been violent when she was young and she "lied to the family before about stuff." Collins suggested a former boyfriend might also be responsible. She said her former boyfriend had been physically abusive when they were together.

Later, a detective asked Collins, "for Abel's own sake and his protection, will you tell me what happened to him?" Collins responded, "I don't know. I doubt his dad [did] anything to him." She claimed, "I want to figure it out and know as much as you guys do." She continued to deny Norwood was responsible, but she said if he were responsible he should attend parenting classes.

Collins eventually acknowledged she had been withholding information from the detectives. She told them that Norwood had "a record" and she did not want anything to happen to him. Collins said Norwood told her to blame her grandmother. She said she "just wanted to protect" Norwood. A detective asked, "Who are you more afraid of losing," Abel or

Norwood? Collins responded, "At this point, both. Abel cause he's my baby and he's the only baby. And then, [Norwood] — he's the only person that actually man wise who I've loved and cared about." Collins admitted the syringe was not hers. Instead, it was Norwood who was a heavy methamphetamine user. Still, Collins denied that Norwood had abused Abel. She said only that his drug use might have caused him to make a "mistake."

During Collins's second interview, she disclosed that Norwood had been convicted of domestic abuse against a former girlfriend, but she initially denied that Norwood physically abused her. Over time, however, Collins acknowledged the violence during her pregnancy and abuse of Abel described above. Collins more squarely admitted Norwood might be responsible, while claiming she was helpless. She told the police "it had to be [Norwood]" because if they "could watch me open a water bottle[,] I can barely open it." Collins later repeated, "Like I told you, I can barely open a water bottle. Half the time, I have to ask somebody."

While Collins continued to deny that she knew Norwood was hurting Abel, she also said she was afraid to "call the police on him." She said Norwood told her if she ever put him in jail, he would give the police a "real reason" to arrest him. Collins said she was scared "of him like tryin' to kill me or something" but she knew "that's not an excuse." Collins said she told Norwood to leave "a few times." When detectives asked why she did not leave with Abel herself, Collins responded, "I didn't wanna leave [Norwood] there with my grandma. What if he did something to her?" The detectives pointed out that Collins could have left with her grandmother or she could have stayed with family. Collins first replied, "She doesn't get along with them,"

and then went on to say, "The only one she's got is Connie and she lives in a trailer but I didn't even think about that."

In a third interview, Collins expressed regret for her inaction. She told detectives, "I should have told [Norwood] to leave [Abel] alone. Leave him next to me. I should have told [Norwood] to leave sooner." When detectives asked Collins if she felt like she failed to protect Abel, she responded, "A little bit," and she explained, "If I would have told [Norwood] to leave sooner or called the police sooner, Abel wouldn't be hurt."

At trial, however, Collins changed her story. She said she lied to police about Norwood's abuse of Abel. She testified that she never saw Norwood bump Abel into things, put his hand over Abel's mouth, squeeze him, or otherwise abuse him. She told the jury the loud bangs she heard were "actually the bassinet hitting the totes on the side of the room." Collins said she would "[d]efinitely" have called police if Norwood had hit Abel.

Collins also denied that Norwood was violent toward her. She said she "[m]ore than likely" would have called police if Norwood had hit her. Collins admitted that Norwood used methamphetamine frequently and had "rage" or anger. When the prosecutor asked why Collins would allow a drug abuser with rage around her son, Collins responded that she needed Norwood's income and help around the house. She said, "I still needed help to get up. I couldn't carry a glass of water by myself."

Collins denied illegal drug use herself. She said that she tried marijuana once and "almost choked to death," but otherwise she had never used.

Collins admitted she lied to police about the syringe and her grandmother's possible responsibility for Abel's injuries. But she denied that she was trying to protect Norwood from law enforcement. On cross-examination, Collins acknowledged that Norwood had done "little stuff" to her while she was pregnant, like pushing her down, kneeing her stomach, and choking her one time. She testified that Norwood had kicked her in the face accidentally while he was asleep. Collins also acknowledged that Norwood said he would make sure Abel was not born, but she explained that Norwood told her she had misunderstood. Collins said Norwood frequently acted as a caring and attentive father during her pregnancy and afterward, including buying prenatal vitamins, attending medical appointments, and singing to Abel in the womb.

Collins professed that she loved Abel more than Norwood, but she acknowledged she "stood up for [Norwood] at every turn." Collins admitted that her statements to police during her first interview showed she cared more about Norwood than Abel. She said her lies affected everyone, and "Abel the most."

In his closing argument, the prosecutor primarily contended that Collins was guilty of implied malice murder as a direct perpetrator. He told the jury, "We have a two-month-old child left to the devices of an abusive, violent, drug-addict boyfriend who was full of rage. . . . [¶] At the time of the act, [Collins] knew her failure to act was dangerous to human life. Anyone would know that those acts are dangerous to human life. It's a two-month-old child. Common sense dictates you know what you've seen, what she said she saw, is dangerous to a two-month-old child. She sees violent shaking, choking, hand over mouth, banging into objects, a two-month-old child. [¶] She deliberately failed to act with a conscious disregard for human

life. Again, consider the knowledge she had. This is knowledge only two people have, her and Matthew. How violent Matthew Norwood was. The injuries he inflicted on her during pregnancy. The threats made against her, against Abel, the rage, the out-of-control drug use, the slamming dope. [¶] It's akin to putting Abel in front of a moving car and saying have at it, knowing all of those things."

While defense counsel agreed that Norwood's care was life-endangering, he argued that Collins had no reason to believe Norwood would be violent. He minimized Collins's statements about her own abuse: "Now, Brittney also told you there was some, what we called, domestic violence in the house. Like a lot of young couples, they say and do mean things, regret it later. That's what I think happened here." And defense counsel contended that Collins thought Norwood was a good father: "[T]his is what she saw. Here's a guy that went through planned parenting, went along with her to get drugs to conceive the baby, went to classes. He was trying to improve." He continued, "She saw [Norwood] as a guy who was taking care of the baby. . . . For two solid months he was doing well, very well, and for some unknown reason snaps. That's not Brittney's fault." Norwood "went berserk just like that and nobody knew that was coming."

The jury rejected this defense and convicted Collins of second degree murder and assault with force likely to cause great bodily injury. (Maj. opn., *ante*, at p. 11.) The Court of Appeal affirmed. It held that the evidence supported the jury's verdict: "There was . . . ample evidence [Collins] knew that when he was high, Norwood could be mean and abusive. Norwood threatened Abel's life while defendant was pregnant and, after his birth, there was evidence defendant witnessed Norwood mistreating her son in a variety of ways prior to [the

fatal abuse]: squeezing Abel hard enough to crack a rib, shaking his head, banging his head into objects, and covering his mouth in order to get him to stop crying. In addition, on multiple occasions she heard loud bangs, which she knew were not innocent or accidental, coming from the room where Norwood was caring for Abel unobserved. [¶] Despite this evidence that defendant knew Norwood was abusing Abel, defendant did nothing to stop the abuse and continued to allow Norwood, while high, to care for her son."

The Court of Appeal found Collins's actions after the fatal attack relevant as well: "Even after [Collins] heard a loud and troubling bang from the room where Norwood was caring for Abel alone and no corresponding cry from Abel, defendant did nothing; she remained on the couch until long after Norwood left the family home in an antsy and atypical manner before belatedly checking on her son's well-being. Then, following Abel's hospitalization, defendant protected Norwood (at his direction) by lying to the police about sundry matters: the hypodermic needle, the possibility of [Collins's grandmother] being responsible for Abel's injuries, and Norwood's prior abuse of her and her infant son." It concluded, "From this and other evidence presented that we find it unnecessary to summarize, a reasonable juror could find defendant, by inaction and even some affirmative actions, knowingly failed to protect her son and thereby aided and abetted Norwood's murder of Abel."

### III. IMPLIED MALICE MURDER

Although the Court of Appeal relied on the theory of aiding and abetting, as noted the prosecutor primarily argued to the jury that Collins was liable as a direct perpetrator of implied malice murder. Sufficient evidence under either theory would

generally be enough to sustain a conviction. "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508 (*Cravens*).) Consistent with the prosecutor's approach, I focus on Collins's liability as a direct perpetrator.

The basic elements of implied malice murder as a direct perpetrator are well settled: "Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*Reyes*, *supra*, 14 Cal.5th at p. 988.)

## A. Evidence of a Culpable Mental State

The majority concludes there was insufficient evidence of Collins's mens rea, or culpable mental state, to support her conviction as a direct perpetrator of implied malice murder. (Maj. opn., *ante*, at pp. 35–36.) As just stated, this mens rea element requires that the defendant " ' " 'knows that his [or her] conduct endangers the life of another and . . . acts with conscious disregard for life.' " ' " (*Reyes*, *supra*, 14 Cal.5th at p. 988; accord, *People v. Knoller* (2007) 41 Cal.4th 139, 143 (*Knoller*).)

Despite our recent reaffirmation of this articulation in *Reyes*, and the majority's recitation of identical language from *Knoller* (maj. opn., *ante*, at p. 35), the majority goes on to immediately disregard it. It finds the mens rea element lacking because, in the majority's view, where a defendant's prosecution is based on a failure to protect, the defendant must "know[] to a

substantial degree of certainty that another's life-endangering act is occurring or is about to occur and fail[] to take reasonable steps to intervene in the face of such an act." (Maj. opn., *ante*, at p. 36, fn. 9.) Although the majority asserts it is "applying decades of precedent," it cites no authority for adding an element to the established standard of implied malice in this context. (*Ibid.*)

To the contrary, decades of precedent establish that culpability for implied malice murder based on a failure to act — including a failure to protect — rests "upon state-of-mind factors applicable generally" to crimes of homicide. (1 LaFave, Substantive Criminal Law (3d ed. 2018) § 6.2(e), pp. 607–608.) The applicable form jury instructions — including those given to the jury here — likewise do not distinguish between an affirmative act and a failure to act by a defendant under a duty to do so. (See CALCRIM No. 520; see also CALJIC No. 8.31.)

The Courts of Appeal have repeatedly recognized this principle, including specifically in the context of a parent's failure to protect. For example, in *People v. Burden* (1977) 72 Cal.App.3d 603, 614 (*Burden*), the defendant argued that he could not be convicted of murder based on his failure to adequately care for his infant son. The *Burden* court disagreed. Consistent with " 'numerous authorities in England and the United States,' " *Burden* held that "[t]he omission of a duty is in law the equivalent of an act and when death results, the standard for determination of the degree of homicide is identical." (*Id.* at p. 616.) In a similar context, *People v. Latham* (2012) 203 Cal.App.4th 319, 327 (*Latham*) held, "The 'omission of a duty is in law the equivalent of an act . . . ' [citation], and thus, a defendant's failure to perform an act that he or she has a legal duty to perform is identical to the defendant's affirmative

performance of an act." Most recently, in *People v. Werntz* (2023) 90 Cal.App.5th 1093, 1115, review granted August 9, 2023, S280278 (*Werntz*), which involved a failure-to-protect murder prosecution, the court explained, "Passive conduct or omissions may satisfy the actus reus component of murder where the person is under a duty to act. [Citations.] And the failure to perform an act that one has a legal duty to perform is legally equivalent to performance of an act."

Our opinion in *Heitzman*, *supra*, 9 Cal.4th 189, approved of this line of authority. Although the majority here purports to "join the majority of our sister courts in recognizing a parent's failure to act can constitute an affirmative act for the purposes of criminal liability in some situations" (maj. opn., *ante*, at p. 14), *Heitzman* already recognized such a rule. We explained, "When a criminal statute does not set forth a legal duty to act by its express terms, liability for a failure to act must be premised on the existence of a duty found elsewhere." (*Heitzman*, at p. 198.) We identified, as one example, that a criminal statute may "embody a common law duty based on the legal relationship between the defendant and the victim, such as that imposed on parents to care for and protect their minor children." (*Ibid*.) For that proposition, we approvingly cited *Burden*, with the parenthetical explanation that *Burden* involved a "murder defendant father under [a] common law duty to care for [his] young son." (*Heitzman*, at p. 198.)

In the absence of any explanation or citation to authority, one must guess at the basis for the majority's departure from the established implied malice standard. The additional element required by the majority appears similar to the mens rea standard required for a direct aider and abettor of an implied malice murder. (See *Reyes*, *supra*, 14 Cal.5th at p. 991

[mens rea requirement includes " 'knowledge that the perpetrator intended to commit *the act*' " and " 'knowledge that *the act* is dangerous to human life' "].)  But direct aiding and abetting is a different theory, and its elements are tailored to its unique context.   The heightened mens rea requirement compensates to some extent for a lesser actus reus requirement. For example, a direct aider and abettor need not personally commit a life-endangering act to be liable for implied malice murder, whereas a direct perpetrator must do so.  (Compare *Reyes*, at p. 991 [actus reus for an aider and abettor " 'includes whatever acts constitute aiding the commission of the life-endangering act' "] with *id.* at pp. 988–989 [actus reus for a direct perpetrator requires " ' " 'an act, the natural consequences of which are dangerous to life' " ' " or which " ' "involve[s] a high degree of probability that it will result in death" ' "].)  A direct aider and abettor's act also need not proximately cause the victim's death, whereas a direct perpetrator's act must do so. (*People v. Franzen* (2012) 210 Cal.App.4th 1193, 1216 (*Franzen*) ["[W]hile the defendant must 'in fact assist[]' the primary actor to commit the offense, there is no requirement that his conduct be a but-for cause or even an essential factor in bringing it about"]; *People v. Swanson-Birabent* (2003)  114 Cal.App.4th 733, 743 (*Swanson-Birabent*) ["The 'act' required for aiding and abetting liability need not be a substantial factor in the offense"]; 2 LaFave, Substantive Criminal Law (3d ed. 2018) § 13.2(a), p. 457.)[3]

---

[3]    The majority appears to invoke aiding and abetting principles based on its belief that a parent who fails to protect his or her child "has not actually done anything themself to

Moreover, the established mens rea requirement for a direct perpetrator already reflects a high degree of culpability. A parent must know that his or her failure to protect endangers the life of the child, and the parent must act with conscious disregard for life. (See *Reyes*, *supra*, 14 Cal.5th at p. 988.) A person who harbors such a mental state is properly held liable for murder in this context just as in any other context, assuming the remaining elements of implied malice murder are also satisfied.

The majority's departure from the established implied malice standard is all the more concerning because the majority has done so in the absence of any briefing by the parties on this issue. Collins did not raise this issue in her petition for review, and neither party advocated for a new or different standard. The parties' briefing was limited by this court to the question of substantial evidence. Collins has never contended that the murder instructions provided to her jury, including CALCRIM No. 520, were erroneous. The majority errs by raising and deciding this apparently dispositive issue on its own accord. (See Gov. Code, § 68081; Cal. Rules of Court, rule 8.516.)

---

affirmatively endanger a child in their care." (Maj. opn., *ante*, at p. 36, fn. 9.) The majority is incorrect. A child relies on his or her parent for care and protection. It is obvious that a parent's failure to protect a child from harm "affirmatively" endangers the child, just like a parent's failure to provide food or secure adequate medical care. (See, e.g., *Werntz*, *supra*, 90 Cal.App.5th at p. 1116 [recognizing that a parent's inaction "endangered" her child], review granted.) The majority itself repeatedly suggests that Collins could be liable for felony child *endangerment*. (Maj. opn., *ante*, at pp. 25, 34; see conc. opn. of Liu, J., *ante*, at p. 12.) Its effort to excuse Collins of all responsibility for endangering Abel here is wholly unpersuasive.

Under the established standard, the evidence supported the jury's finding that Collins harbored the mental state required for implied malice murder, i.e., she knew her failure to act endangered Abel's life and she acted in conscious disregard for life.  Collins knew Abel was a fragile two-month-old infant who had spent time in the NICU at birth.  Based on her own admissions, Collins knew Norwood was a violent methamphetamine addict who had threatened Abel's life, did not believe Abel was his son, quickly became angry whenever Abel exhibited normal behaviors, and had severely abused Abel on numerous prior occasions.  Collins knew Norwood had shaken Abel, choked him, smacked him, bounced him too hard, covered his mouth to keep him from crying, and crushed his body with extreme force that Collins knew could fracture a rib — and which did in fact do so.  Collins admitted she thought Norwood had hit Abel.  She saw Norwood with his fist raised against Abel, and Abel's eyes were red and swollen like he had already been hit.  Collins heard Norwood "thump[ing]" Abel five or six times in the weeks before his fatal abuse, and she knew Norwood's explanations for these noises were false.

In her briefing, Collins concedes she admitted to police that "she knew Norwood had previously assaulted Abel enough to cause serious injury."  The majority likewise admits, "There was certainly a reasonable inference that Collins knew Norwood's care posed a high risk of serious injury to their child." (Maj. opn., *ante*, at p. 25.)  A reasonable jury could look at the facts and go further.  With a history of abuse severe enough to cause serious injury, a jury could readily infer that allowing Norwood to care for Abel risked life-threatening abuse as well. Abel was a fragile two-month-old infant, and the jury could reasonably find that abuse causing serious injury also

26

threatened Abel's life.  It could also reasonably find that Collins would make the same connection:  "It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, [the defendant] was aware of the risk."  (*People v. Moore* (2010) 187 Cal.App.4th 937, 941.)  In addition, the jury heard evidence that Collins was educated (she had an associate's degree in criminal justice administration) and that she had been specifically instructed regarding the risk of death from shaking or otherwise abusing an infant.  The jury could reasonably find that Collins subjectively knew Norwood's abuse threatened Abel's life.

On the day of the fatal abuse, this danger was acute.  The jury could reasonably find that Collins knew Norwood was high on methamphetamine, and she knew Norwood was even more likely than usual to lash out violently against Abel because Abel was fussy.  Norwood had argued with Collins and become violent, breaking her phone.  The jury could reasonably conclude that Collins knew she was endangering Abel's life by allowing Norwood to care for Abel under these circumstances.[4]

---

[4]    The majority contends that this dissent's reasoning "reveals how the now-invalid natural and probable consequences doctrine undergirds the dissent's position."  (Maj. opn., *ante*, at p. 27, fn. 8.)  It claims, "According to the dissent's logic, if the jury reasonably found Collins knew Norwood committed felony child abuse, it effectively could impute malice."  (*Ibid.*)  The majority mischaracterizes the dissent's position. As explained above, the evidence — including Collins's own admission that "she knew Norwood had previously assaulted Abel enough to cause serious injury" — supports the reasonable inference that Collins knew Norwood's care was life-endangering.  The jury was not required to limit its inferences

The majority asserts that consideration of Norwood's anger and violence toward Collins is "problematic" and "should be done, if at all, with caution." (Maj. opn., *ante*, at p. 24.) The meaning of the majority's comment is unclear. The majority does not say this evidence is irrelevant or otherwise inadmissible. It does not attempt to assess this evidence in light of the relevant legal doctrines, such as implied malice or duress. The majority notes that evidence of intimate partner violence can be used as a factor in mitigation at sentencing, but sentencing is a separate proceeding and it is premised on a criminal conviction. The use of such violence as a mitigating factor at sentencing does not preclude its use as incriminating evidence at trial, if it is relevant to an issue in dispute.

The majority also confusingly states that "even if Norwood's anger towards Collins could support an inference about Collins's knowledge of the danger Norwood posed to Abel, it would presumably also raise an even stronger inference about the danger Norwood posed to *Collins*." (Maj. opn., *ante*, at p. 23.) But the jury did not have to follow this reasoning or believe the threat posed by Norwood was symmetrical. Instead, the jury could have believed Norwood posed a much greater threat to Abel. Collins minimized her own abuse at trial, and the jury could reasonably have believed that Norwood's anger that day

---

to Collins's express admissions. No imputation was required, and under the instructions provided to the jury, no imputation was allowed.

would find expression in severe physical violence toward Abel, not Collins.[5]

The majority asserts that Norwood's prior abuse was "different in kind from Norwood's fatal act" (maj. opn., *ante*, at p. 36), but the majority does not explain how any alleged difference could affect Collins's perception of the risk when she allowed Norwood to care for Abel that day. Regardless of the character of Norwood's final act of abuse, a reasonable jury could find that Collins knew Norwood's care endangered Abel's life based on the facts known to Collins *prior* to that final act. For example, the fact that Norwood's fatal abuse caused external injuries does not mean that Abel's prior internal injuries were inconsequential. The majority claims that "the record does not support a conclusion that Collins was aware that Norwood had caused serious injury to Abel prior to the fatal act." (Maj. opn., *ante*, at p. 37, fn. 10.) But, as noted, Collins herself concedes in her briefing that she admitted to police that "she knew Norwood

---

[5]   The majority discounts these facts because, in its view, "there is no evidence [Norwood] was still upset six hours later when he went to change and feed Abel." (Maj. opn., *ante*, at p. 23.) But a reasonable jury would not need specific testimony about Norwood's mental state to infer that Norwood was still "upset" in the afternoon. It could reasonably infer that Norwood continued to be angry and upset that afternoon because he was angry and upset earlier, he was often angry and upset, he had used methamphetamine (which made him more angry and upset), and he needed to set out to find more methamphetamine (which the jury could infer would make a heavy drug user like Norwood even more angry and upset).

had previously assaulted Abel enough to cause serious injury." The majority's contrary view is unfounded.[6]

---

[6] The majority also cites the nurse practitioner's testimony regarding her examination of Abel. (Maj. opn., *ante*, at pp. 26–27, fn. 7, 32; see *id*. at p. 37, fn. 10.) But, as explained above, it was for the jury to determine whether to believe this testimony. It was plainly self-serving, since the nurse could be subject to discipline or criticism for failing to conduct a comprehensive examination or failing to notice an injury on Abel. The nurse's testimony was also directly contradicted by Collins's statement to police that the nurse recognized Abel's swollen leg.

The majority apparently concludes the jury was *required* to believe the nurse practitioner's testimony in the absence of evidence that she "abrogated her duties while repeatedly examining Abel and lied while testifying." (Maj. opn., *ante*, at pp. 26–27, fn. 7.) The implications of the majority's conclusion are startling. Juries are commonly called upon to consider the credibility of medical professionals. Under the majority's reasoning, a jury would be *required* to credit the testimony of a medical professional, no matter how self-serving, unless specific evidence of lying or other breach of duty were presented. That is not the law. A jury may disbelieve a witness for any rational reason, including the witness's "demeanor while testifying" and the "existence or nonexistence of a bias, interest, or other motive." (Evid. Code, § 780, subds. (a), (f); see *Lopez, supra*, 14 Cal.5th at p. 591.) The jury here was so instructed. (See CALCRIM No. 226; see also CALJIC No. 2.20.) The majority's contrary conclusion rests on its misapplication of authorities considering the evidentiary support for affirmative findings, rather than credibility determinations. The two are not the same.

In any event, even if the jury had accepted the nurse practitioner's testimony at face value, the jury could reasonably have given this evidence little or no weight in determining Collins's state of mind. It could reasonably believe that the nurse failed to notice external injuries on Abel, either through negligence or because Collins failed to disclose the abuse she had

The majority asserts it would be "far reaching and without precedent" to conclude that "a parent (or any other individual with a duty to protect a child) can be held liable for murder if they have witnessed a past act of child abuse and the child is later killed." (Maj. opn., *ante*, at pp. 36–37, fn. 10.) I agree. But "witness[ing] a past act of child abuse" and the fact of a "later kill[ing]" come nowhere close to describing the evidence in this case or the elements of implied malice murder the jury was required to find in order to convict Collins.

A reasonable jury could also find that Collins acted with conscious disregard for life. Collins knew the risk that Norwood posed to Abel, but she allowed Norwood to care for Abel anyway. After the final act of abuse, Collins aligned herself with Norwood, not Abel. When Collins heard the loud bang that was Norwood slamming Abel against a hard surface — after which Abel went silent — Collins did nothing to investigate. Even though she claimed to have been concerned on prior occasions, Collins did not check on Abel for over an hour, even after Norwood was "real antsy" and left the home in a hurry. The jury could reasonably find that Collins consciously disregarded what

witnessed. And, even if Abel had no external injuries, that circumstance does not foreclose the reasonable inference that Collins knew Norwood's care threatened Abel's life in light of the threats, violence, and abuse Collins had actually witnessed — including Collins's own admission that she witnessed abuse sufficient to cause serious injury to Abel. By elevating the nurse practitioner's testimony over contrary evidence, the majority fails to respect "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." (*Jackson, supra,* 443 U.S. at p. 319; accord, *Mumin, supra,* 15 Cal.5th at p. 198.)

31

had happened to Abel, just as she disregarded the risk to his life presented by Norwood's care.

The jury could then reasonably find that Collins acted to protect Norwood, rather than assist medical professionals treating Abel or police investigating his injuries, even though Collins immediately thought Norwood was responsible. Instead of being angry with Norwood, Collins told Norwood she would not "throw [him] under the bus," took responsibility for a syringe found in their home, denied Norwood's abuse of Abel to police, and callously placed the blame for Abel's death on her grandmother. When a detective asked Collins who she was more afraid of losing, Norwood or Abel, Collins said "both" — she did not choose Abel. At trial, Collins agreed she "stood up for [Norwood] at every turn." Based on this evidence, a reasonable jury could infer that Collins had "stood up for [Norwood]" prior to the fatal abuse as well, consciously disregarding the risk of Norwood's care in order to maintain her relationship with him.

The majority focuses on other evidence, and it claims "[t]he facts of this case stand in stark contrast to other cases in which a parent knew of the danger posed to their child's life and failed to act due to a lack of concern as to whether the victim lived or died." (Maj. opn., *ante*, at p. 37.) The majority's approach is flawed.

First, the majority ignores our repeated admonition that, in considering the sufficiency of the evidence, "comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) We must focus on "the unique facts and inferences present in each case," rather than make comparisons between

cases. (*People v. Rundle* (2008) 43 Cal.4th 76, 137; accord, *People v. Smith* (2005) 37 Cal.4th 733, 745.) Such comparisons are especially unhelpful where, as here, the prior cases found the evidence sufficient. The evidence in such cases does not establish a floor that must be met in order to support a judgment; the evidence in those cases may (and here did) far exceed the minimum necessary to sustain a judgment. Where the evidence supports the required elements in the case at bar, "the attempt to contrast this case with others falls short." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1075.)

Second, the implied malice standard is not equivalent to a simple lack of concern. It is awareness and conscious disregard of a specific risk. "[I]mplied malice requires a defendant's awareness of engaging in conduct that endangers the life of another — no more, and no less." (*Knoller, supra*, 41 Cal.4th at p. 143.) The jury may well have believed that Collins loved Abel and was distressed by Norwood's repeated abuse. But, at the same time, the jury could reasonably have found that Collins prioritized her relationship with Norwood over Abel's well-being. Collins knew of the lethal risk posed by Norwood's care, but she consciously disregarded it for reasons she felt were more important than Abel, i.e., maintaining her relationship with Norwood and minimizing conflict with him. (See *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 103 (*Nieto Benitez*) ["Ill will toward, or hatred of, the victim are not prerequisites of malice as that term is used in the statutory definition of murder"]; see also *Latham, supra*, 203 Cal.App.4th at p. 334 [finding sufficient evidence of implied malice where parents failed to obtain adequate medical care for their daughter, notwithstanding evidence that the parents "loved [their daughter] and did not want her to die"].)

Third, the jury was not required to believe the evidence credited by the majority.  For example, a reasonable jury could believe Collins was lying about "taking Abel away from Norwood when she believed Norwood was being too rough" and "telling Norwood to move out the very morning that Abel was killed." (Maj. opn., *ante*, at p. 38.)  At various times, Collins had lied about nearly every fact or circumstance at issue in this proceeding.  The jury could reasonably believe Collins's exculpatory statements were lies as well.  As another example, the majority writes, "*Importantly*, Collins (and her grandmother) observed no signs of physical injuries prior to the fatal act." (Maj. opn., *ante*, at p. 26, italics added.)  But it was up to the jury to determine whether this testimony was important, or whether instead it should simply be discounted, disregarded, or disbelieved.  It was obviously self-serving, and it contradicted Collins's explicit admission that she *had* noticed physical injuries:  a swollen leg (likely from Norwood roughly turning Abel over) and red, swollen eyes (likely from Norwood striking him).  In any event, Collins's knowledge of Norwood's lethal threats, violence, drug addiction, and prior severe abuse support the reasonable inference that she knew his care threatened Abel's life, regardless of whether Norwood's prior abuse caused any noticeable external injury.[7]

Contrary to the majority's position, "[t]he jury was not compelled to credit the defense version" of the relevant events.

---

[7]    Again adopting a perspective favorable to the defendant, the majority points out "there was no evidence Norwood had brutalized other children." (Maj. opn., *ante*, at p. 28.)  The significance of this circumstance is unclear.  There was ample evidence Collins was aware Norwood had brutalized *this child*. One brutally abused child is enough.

(*Cravens, supra,* 53 Cal.4th at p. 510.) It could instead have looked skeptically at Collins's exculpatory statements and testimony, and it could have believed that even Collins's incriminating admissions understated her awareness of Norwood's abuse of Abel. The jury watched Collins testify, and it heard her recorded interviews with police and her conversation with Norwood. The jury was in the best position to determine Collins's credibility, and it was the jury's " 'exclusive province' " to do so. (*Mumin, supra,* 15 Cal.5th at p. 202.) For both practical and legal reasons, we must defer to the jury's credibility determinations. We must reject any temptation to make such determinations ourselves, based on the cold record before us.

Our standard of review requires this court to ask how the jury could have viewed the evidence, drawing all reasonable inferences in favor of the jury's verdict. It does not allow this court to ask how it would have viewed the evidence or whether it would have found the defendant guilty beyond a reasonable doubt. The majority ignores this distinction.[8]

---

[8] The majority's failure to adhere to the standard of review extends to the out-of-state authorities on which it relies. For example, the majority states that it finds *Glenn v. State* (Ga. 2004) 602 S.E.2d 577 "instructive" (maj. opn., *ante,* at p. 29), but that opinion applied a standard of review that differs from our substantial evidence review. *Glenn* found insufficient evidence of aiding and abetting because the prosecution "failed to exclude the reasonable hypothesis" that the defendant was unaware of the charged abuse. (*Glenn,* at p. 580.) But under our precedents, as this court recently confirmed, the existence of a reasonable alternative hypothesis does not undermine the jury's verdict, so long as the hypothesis adopted by the jury was

## B. Evidence of a Sufficiently Dangerous Act

As noted, the actus reus or objective component of implied malice murder required the jury to find that Collins's failure to protect Abel was dangerous to life. This component of implied malice requires that " ' " 'the natural consequences of [the failure to protect] are dangerous to life.' " ' " (*Reyes*, *supra*, 14 Cal.5th at p. 988.) In other words, "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' " (*Id.* at p. 989.) Although the majority finds it unnecessary to consider this element, I would conclude that the evidence was sufficient.

In her briefing, Collins relies on our conclusion in *Reyes* that the evidence of this objective component was lacking. (*Reyes*, *supra*, 14 Cal.5th at p. 989.) *Reyes* involved a situation where the defendant and his fellow gang members, "one of whom was armed, bicycled to an area on the edge of territory belonging to a rival gang." (*Ibid.*) We explained, "It may have been likely that this act would result in some sort of gang confrontation, and it is possible that someone would get hurt or killed. But the act

---

reasonable as well. (*Mumin, supra*, 15 Cal.5th at pp. 197–198; see *id.* at p. 200 ["Ultimately, it remains for the jury to determine whether that inference is the only reasonable one"].) " 'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*Westerfield, supra*, 6 Cal.5th at p. 713.)

does not by itself give rise to a high degree of probability that death will result." (*Ibid*.)

The evidence in this matter is far different from the evidence in *Reyes*. The danger to Abel's life presented by Norwood's care was not merely theoretical; it was actual. The jury could readily find that Norwood had already violently shaken Abel, a fragile two-month-old infant, while crushing his ribcage, resulting in the fracture of seven ribs. At trial, a doctor testified that these rib fractures "are very clearly associated with violent shaking of an infant" and "extreme chest compressions most often during an extremely violent shaking process to the infant, such that the ribs snap along the back near the spine."

In addition, a reasonable jury could find that Norwood did not believe Abel was his son, he had already threatened Abel's life, he had assaulted Collins while pregnant in order to make her lose Abel, and he had committed numerous additional acts of severe abuse: choking Abel, smacking him, hitting his head on furniture, "bounc[ing]" him too hard, and "thump[ing]" him five or six times in the week or two prior to the fatal abuse. On the day of the fatal abuse, Norwood was high on methamphetamine and had already lashed out violently at Collins. Abel was fussier than usual because of his vaccinations the previous day. A reasonable jury could find that the danger of severe, life-threatening abuse was apparent if Collins allowed Norwood to care for Abel. Indeed, defense counsel conceded in his closing argument at trial that "of course, that would be true," that the natural and probable consequences of Collins's failure to act were dangerous to human life.

## C. Evidence of Proximate Causation

A defendant's act or culpable omission must also proximately cause the victim's death. Again, although the majority finds it unnecessary to consider this element, I would conclude the evidence was sufficient.

" ' "To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical." ' " (*Reyes*, *supra*, 14 Cal.5th at p. 988.) It must be " 'an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur.' " (*People v. Cervantes* (2001) 26 Cal.4th 860, 866.) "Whether the defendant's conduct was a proximate, rather than remote, cause of death is ordinarily a factual question for the jury unless ' "undisputed evidence . . . reveal[s] a cause so remote that . . . no rational trier of fact could find the needed nexus." ' " (*People v. Butler* (2010) 187 Cal.App.4th 998, 1010.)

For example, "Shots that cause a driver to accelerate impulsively and run over a nearby pedestrian suffice to confer liability [citation]; but if the driver, still upset, had proceeded for several miles before killing a pedestrian, at some point the required causal nexus would have become too attenuated for the initial bad actor to be liable even for manslaughter, much less for first degree murder. It is a natural consequence that shots fired at a boat may cause a passenger to leap out and thereby cause another in the boat to drown [citation]; but if the boat had capsized, floated some miles down the river and over a waterfall, and fallen on the head of another boater, the shooter probably

would not be criminally liable for that boater's death." (*People v. Roberts* (1992) 2 Cal.4th 271, 321.)

Here, a reasonable jury could find that Abel's death was a direct, natural, and probable consequence of Collins's failure to protect him. A reasonable jury could readily infer that, but for Collins's failure to protect Abel, he would not have died. If Collins had not allowed Norwood to care for Abel, he would not have had the opportunity to fatally injure him. Collins herself admitted, "If I would have told [Norwood] to leave sooner or called the police sooner, Abel wouldn't be hurt. He'd be home with me . . . ." A reasonable jury could find that Collins's failure to protect Abel was a cause-in-fact of his death.

Moreover, for the reasons already explained (see pt. III.B., *ante*), the evidence supports the jury's finding that the direct, natural, and probable consequence of Collins's inaction was Abel's death from Norwood's abuse. Norwood had threatened Abel's life, violently assaulted Collins while she was pregnant, and repeatedly and severely abused Abel after he was born. On the day of the fatal abuse, Abel was fussier than usual, while Norwood was rageful and high on methamphetamine. The jury could reasonably find that a direct, natural, and probable consequence of allowing Norwood to care for Abel in this state would be Abel's death. Collins's role was not " ' "insignificant or merely theoretical" ' " (*Reyes*, *supra*, 14 Cal.5th at p. 988); her unreasonable failure to protect Abel was the reason why Norwood had the opportunity to fatally abuse Abel in the first place. The jury could reasonably have believed that Collins was fully capable of caring for Abel — or leaving with him — but Collins did not do so because she valued her relationship with Norwood more than she valued Abel's well-being. A reasonable jury could find that this culpable and deliberate conduct

proximately caused Abel's death. (See *Palmer v. State* (Md. 1960) 164 A.2d 467, 474 [defendant's inaction was a proximate cause of victim's death where defendant "easily could, and should, have removed" the victim from the care of the abuser].)[9]

### D. Parental Duty to Protect

As noted, the existence of a duty owed to Abel, and Collins's breach of that duty, supplies the act required for criminal liability. (See *Heitzman*, *supra*, 9 Cal.4th at p. 198.) The majority agrees that " ' "[a] parent has a legal duty to his or her minor child to take every step reasonably necessary under the circumstances in a given situation to exercise reasonable care for the child, to protect the child from harm, and to obtain reasonable medical attention for the child." ' " (Maj. opn., *ante*, at p. 14, quoting *People v. Rolon* (2008) 160 Cal.App.4th 1206, 1213 (*Rolon*).) Collins's jury was instructed on this principle as well.

---

[9] The fact that Norwood inflicted the fatal blow against Abel does not relieve Collins of responsibility for his death. " 'To relieve a defendant of criminal liability, an intervening cause must be an unforeseeable and extraordinary occurrence. [Citation.] The defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act.' " (*People v. Carney* (2023) 14 Cal.5th 1130, 1139.) It was entirely foreseeable that something would prompt Norwood to inflict violence on Abel. It had happened numerous times before, including similar loud "thumps" five or six times in the prior week or two alone. Neither Norwood's abuse nor whatever triggered it was an " 'unforeseeable and extraordinary occurrence' " that would relieve Collins of criminal liability. (*Ibid*.) They reflected, instead, the precise risk of which Collins was aware and against which Collins should have protected Abel.

" 'This is not to say that parents have the legal duty to place themselves in danger of death or great bodily harm in coming to the aid of their children. To require such, would require every parent to exhibit courage and heroism which, although commendable in the extreme, cannot realistically be expected or required of all people. But parents do have the duty to take every step reasonably possible under the circumstances of a given situation to prevent harm to their children. [¶] In some cases, depending upon the size and vitality of the parties involved, it might be reasonable to expect a parent to physically intervene and restrain the person attempting to injure the child. In other circumstances, it will be reasonable for a parent to go for help or to merely verbally protest an attack upon the child. What is reasonable in any given case will be a question for the jury after proper instructions from the trial court.' " (*Swanson-Birabent*, *supra*, 114 Cal.App.4th at p. 745; see maj opn., *ante*, at pp. 15–16.)

A reasonable jury could find that Collins did not take every step reasonably necessary under the circumstances to protect Abel, and she therefore breached her duty to protect Abel. The majority appears to agree: It recognizes Collins's admission that "she should have done a better job in protecting Abel," and it acknowledges that her "sentiments support a reasonable inference that she recognized, in hindsight, she did not behave as a reasonable parent." (Maj. opn., *ante*, at p. 34.) The majority's acknowledgement is well taken. It is clear that a reasonable jury could find that Collins did not take every step reasonably necessary to protect Abel from Norwood's abuse. (See *Rolon*, *supra*, 160 Cal.App.4th at p. 1221 ["a reasonable jury could infer that appellant was capable of taking some action to protect her child and that she chose not to do so"].)

First, the jury could have found that it was reasonably necessary for Collins to care for Abel herself, at least while Norwood was high on methamphetamine, and a reasonable parent could and would have done so. The evidence showed that Collins was capable of doing so, and the record is devoid of any evidence that Collins risked her physical well-being by insisting she care for Abel rather than Norwood. To the contrary, Collins found Norwood's own insistence "weird" because she commonly took care of Abel. Collins herself told detectives that she should have told Norwood to leave Abel alone and "[l]eave him next to me."

Second, the jury could have found that it was reasonably necessary for Collins to force Norwood to leave, and a reasonable parent could and would have done so. Although Collins told police she asked Norwood to leave in the past, she never explained why he had not done so. A reasonable jury could have either disbelieved Collins or determined that she had not taken reasonable steps in this regard. Indeed, Collins told detectives, "I should've told [Norwood] to leave sooner." At trial, Collins admitted she "should have tried harder to make [Norwood] leave."[10]

---

[10] The majority contends that Norwood's status as Abel's father is "highly relevant" to Collins's ability to protect Abel. (Maj. opn., *ante*, at pp. 16, 33.) While this relationship may be relevant, it does not require Collins to allow whatever abuse Norwood chose to inflict. To the contrary, given Norwood's lethal threats and severe abuse against Abel, a reasonable jury could have rejected any suggestion that Collins was required to defer to Norwood's rights to the companionship, care, custody, and management of Abel. The majority emphasizes Norwood's parental rights, but it does not contend that Collins was

Third, the jury could have found that it was reasonably necessary for Collins to leave with Abel, and a reasonable parent could and would have done so. When asked about this possibility, Collins said she did not want to leave her grandmother with Norwood because "[w]hat if he did something to her?" When asked why her grandmother could not come with her, Collins first said her grandmother "doesn't get along with" her family members, but then Collins realized there was "Connie" — "she lives in a trailer but [Collins] didn't even think about that." A jury could reasonably find these excuses for not leaving were mere pretext, and they were wholly inadequate given the magnitude of harm facing Abel. Even considering these statements on their own terms, Collins immediately remembered a person with whom her grandmother could stay, and her grandmother did in fact stay with family or friends after the fatal attack on Abel. Collins herself had family members and former foster parents who were willing to help. For example, one former foster parent specifically testified at trial that, if Collins had contacted her in the weeks leading up to Abel's death, she would have let Collins live with her.[11]

somehow prohibited from taking steps to protect Abel from Norwood's abuse. As noted, Collins herself admitted she could and should have done more to protect Abel, including taking care of Abel herself or prompting Norwood to leave her grandmother's home.

[11] The majority asserts that "a significant body of social science evidence demonstrates that the risk of being killed by one's abuser increases significantly when a victim of intimate partner violence attempts to leave their abuser." (Maj. opn., *ante,* at p. 16; see *id.* at pp. 33–34.) The concurring opinion likewise relies on extra-record evidence throughout. This

evidence was not before the jury, so it is irrelevant to our substantial evidence review. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 405.) As the majority itself states, "Our command as a reviewing court in evaluating a sufficiency of the evidence claim is to consider the actual evidence before the jury and reasonable inferences favorable to the prosecution that the jury could have drawn from that evidence." (Maj. opn., *ante*, at p. 7, fn. 2.)

Our concurring colleague writes that "facts about the inability of women who are victims of domestic violence to leave their abusers" informs his view of what was reasonable for the jury to infer from the evidence. (Conc. opn. of Liu, J., *ante*, at p. 10.) As a general matter, I do not disagree. The severe burdens suffered by victims of domestic or intimate partner violence are widely known. Just like other matters of common sense and experience, these burdens may be considered by the jury and by a reviewing court. (See, e.g., *People v. Leonard* (2007) 40 Cal.4th 1370, 1414; *People v. Yeoman* (2003) 31 Cal.4th 93, 162.) But our consideration of common sense and experience is quite different from accepting the truth of findings in social science evidence that is identified by the parties or the members of this court for the first time on appeal. The concurring opinion suggests there is precedent for such an approach (conc. opn. of Liu, J., *ante*, at p. 11), but the cited precedents — both original writ proceedings in this court, not appeals — used social science evidence to evaluate whether burdens on fundamental constitutional rights or unequal treatment under the law were adequately justified. These inquiries and their procedural postures are not analogous to our consideration of the evidence supporting the jury's verdict here. Nor is it clear that those precedents involved evidence raised for the first time by the court or its members, without notice or opportunity for briefing by the parties, as occurred here. (Cf. Evid. Code, § 459, subd. (c); cf. also Lenhardt, *Beyond Analogy:* Perez v. Sharp*, Antimiscegenation Law, and the Fight for Same-Sex Marriage* (2008) 96 Cal. L.Rev. 839, 849 [describing evidence cited by the parties in their briefing].)

In any event, whatever the merits of such an approach in constitutional cases, there is no precedent for considering

As discussed, because Collins had a duty to act, but failed to fulfill that duty, her failure to act was the same as an affirmative act for purposes of murder liability. (*Heitzman, supra,* 9 Cal.4th at p. 198; *Werntz, supra,* 90 Cal.App.5th at p. 1115, review granted; *Latham, supra,* 203 Cal.App.4th at p. 327; *Burden, supra,* 72 Cal.App.3d at p. 616.) And, because a reasonable jury could find that Collins's failure to act was accompanied by implied malice, her conviction for second degree murder was supported by the evidence and should be affirmed. (See *Cravens, supra,* 53 Cal.4th at p. 508.)

---

evidence that could have been presented to the jury, but was not, in order to undermine the evidentiary foundation for a jury's verdict. Our precedents are, instead, directly to the contrary. (See, e.g., *People v. Reed* (2018) 4 Cal.5th 989, 1007, fn. 9 ["when considering the sufficiency of the evidence, of course, we are limited to considering the evidence actually presented to the jury"]; *People v. Jenkins* (2000) 22 Cal.4th 900, 952 [" 'our review on direct appeal is limited to the appellate record' "].) It is well settled that "an appellate court generally is not the forum in which to develop an additional factual record, particularly in criminal cases when a jury trial has not been waived." (*People v. Peevy* (1998) 17 Cal.4th 1184, 1207.)

Finally, even if this social science evidence had been presented at trial and considered by the jury, the jury would not have been required to find that it accurately described the circumstances *here*. Collins never said she was afraid of leaving Norwood, and she never said that she believed he would kill her if she tried. At trial, both Collins and her counsel denied and minimized the abuse she had suffered. It was not unreasonable for the jury to infer that Collins could have left Norwood (or that she could have prompted Norwood to leave, or simply taken care of Abel herself, as Collins admitted she should have done).

## IV. DIRECT AIDING AND ABETTING

Because the evidence supports Collins's liability for implied malice murder as a direct perpetrator, and there is no indication in the record that the jury relied solely on the alternate theory of direct aiding and abetting, it is unnecessary to consider whether the evidence would support Collins's conviction on this theory as well. (See *Ghobrial*, *supra*, 5 Cal.5th at p. 278 ["When 'there are two possible grounds for the jury's verdict, one unreasonable and the other reasonable, we will assume, absent a contrary indication in the record, that the jury based its verdict on the reasonable ground' "].)

It is necessary, however, to address the law of direct aiding and abetting, since the majority again appears to depart from our precedents in this area. We recently reaffirmed the elements of direct aiding and abetting an implied malice murder: " '[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. [Citation.] In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (*Reyes*, *supra*, 14 Cal.5th at pp. 990–991.)

The majority conceives of the relevant act by the perpetrator, Norwood, as the fatal blow itself. (Maj. opn., *ante*, at p. 20.) The Attorney General also appears to accept this framing. But it bears emphasizing that our precedents do not require that the life-endangering act be the act that most directly causes death. (See *Knoller*, *supra*, 41 Cal.4th at p. 158 ["The immediate cause of [the victim's] death was [the defendant's] own conscious decision to take the dog Bane unmuzzled through the apartment building"]; *Nieto Benitez*, *supra*, 4 Cal.4th at pp. 105–106 [relevant life-endangering act was not fatal shooting, which may have been accidental, but act of brandishing weapon]; see also *People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 502 [life-endangering act was "participation in an armed melee"].) On the facts of this case, an argument could be made that Norwood's care for Abel, while Norwood was under the influence of methamphetamine, was the life-endangering act. Under that theory, Collins would be liable for implied malice murder as an aider and abettor if Collins knew Norwood intended to commit that act, she intended to aid him in that act (and did in fact do so), she was aware the act was dangerous to human life, and she acted with conscious disregard for life. Because this theory was not raised by the Attorney General, the majority does not consider it. But the majority's opinion should not be interpreted to require that the relevant life-endangering act for direct aider and abettor liability be the act that most directly caused death.

Likewise, in a discussion properly viewed as dicta,[12] the majority struggles to define the actus reus required of Collins as the aider and abettor. The majority criticizes the prosecution for suggesting that "Collins could have left Norwood by moving out of her grandmother's home and living with other family, could have called the police, or could have reported Norwood to Abel's examining physician." (Maj. opn., *ante*, at p. 32.) But if a reasonable parent under the circumstances would have taken these steps, Collins's failure to do so constitutes an affirmative act for purposes of aider and abettor liability. (See *Heitzman, supra*, 9 Cal.4th at p. 198; *Rolon, supra*, 160 Cal.App.4th at p. 1213; *Swanson-Birabent, supra*, 114 Cal.App.4th at p. 744.) The jury here was similarly instructed that "[t]he word 'act,' as used in these instructions, includes an omission or failure to act in those situations where a person is under a legal duty to act." Collins has never contended that this instruction misstates the law.

The majority asserts that "this reasoning effectively resurrects the natural and probable consequences theory of liability by permitting liability for murder based on a parent's failure to protect their child from felony child abuse." (Maj. opn., *ante*, at p. 32.) The majority is mistaken. The remaining elements of aiding and abetting an implied malice murder must still be satisfied, including that Collins intended to aid Norwood's life-endangering act through her own failure to act,

---

[12] " 'Dicta consists of observations and statements unnecessary to the appellate court's resolution of the case.' " (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1158.) The majority's discussion of the actus reus required for direct aiding and abetting is dicta because it never reaches the conclusion that the evidence failed to support this element.

that Collins was aware Norwood's life-endangering act was dangerous to human life, and that Collins acted with conscious disregard for life. These elements far exceed the showing required for aiding and abetting under a theory of natural and probable consequences, which did not require an aider and abettor to be aware the perpetrator's act was dangerous to human life or require an aider and abettor to act with conscious disregard for life.

The majority also purports to place on the prosecution the burden of proving that "any steps the parent failed to take carry a high probability of preventing or stopping the life-endangering act." (Maj. opn., *ante*, at p. 31.) This requirement appears to be fashioned out of whole cloth. The significance of an aider and abettor's act (or failure to act) is in aiding or encouraging the direct perpetrator to commit the offense or life-endangering act. As noted, the act (or failure to act) need not itself cause the commission of the offense or life-endangering act. "[W]hile the defendant must 'in fact assist[]' the primary actor to commit the offense, there is no requirement that his conduct be a but-for cause or even an essential factor in bringing it about." (*Franzen*, *supra*, 210 Cal.App.4th at p. 1216; accord, *Swanson-Birabent*, *supra*, 114 Cal.App.4th at p. 743; 2 LaFave, Substantive Criminal Law, *supra*, § 13.2(a), p. 457.)

Finally, the majority's discussion of aiding and abetting again departs significantly from our established standard of review. Rather than viewing the record in the light most favorable to the judgment, and drawing all reasonable inferences in favor of Collins's conviction, the majority credits Collins's testimony and indulges in inferences favorable to her. It omits or minimizes incriminating facts and inferences while emphasizing Collins's perspective. In effect, the majority

decides for itself whether it believes Collins was guilty beyond a reasonable doubt, rather than determining whether a reasonable jury could do so.

For example, as noted, the majority simply accepts that "Collins (and her grandmother) observed no signs of physical injuries prior to the fatal act" (maj. opn., *ante*, at p. 26), despite the self-serving nature of their statements and the existence of directly contrary evidence. It also accepts that "it was Collins's act of confronting Norwood about his drug use and demanding he move out" — acts the majority credulously accepts as "steps that were taken to protect herself and Abel" — that "triggered Norwood's angry outburst towards Collins and the damage of her phone." (Maj. opn., *ante*, at p. 24.) But the jury did not have to believe that Collins confronted Norwood about his drug use or that she demanded he move out. It could have accepted Collins's testimony that they fought and Norwood broke her phone, but disbelieved Collins's exculpatory explanation. (*Lopez, supra*, 14 Cal.5th at p. 591.)

The following passage, from the majority's discussion of actus reus, illustrates the majority's errors most clearly: "Contrary to failing to act in response to Norwood's previous acts of abuse, there was evidence Collins *did* take affirmative and reasonable steps to protect Abel based on the information known to her and in light of her physical state. Collins proactively took Abel to wellness checks and secured medical care for him as needed. As to Norwood's prior abuse of Abel, Collins either physically took Abel away from Norwood or would tell Norwood to stop being physical with Abel when Collins thought Norwood was being too rough with him. On other occasions, Collins told Norwood to leave. On the morning of the life-endangering act, Collins and Norwood got into an argument about Norwood's

drug use and Collins demanded that he move out. Collins took these steps even while in a compromised physical state and reliant upon Norwood, as Abel's father, for practical and financial support." (Maj. opn., *ante*, at pp. 32–33.)

Aside from perhaps that Collins took Abel to regular wellness checks, the jury did not have to credit any of these facts, since they are based on Collins's own self-serving and often contradictory statements. The jury did not have to believe that "Collins either physically took Abel away from Norwood or would tell Norwood to stop being physical with Abel." It did not have to believe that "Collins told Norwood to leave." It did not have to believe that "Collins and Norwood got into an argument about Norwood's drug use and Collins demanded that he move out." It did not have to believe that Collins was "in a compromised physical state" or that she was "reliant upon Norwood, as Abel's father, for practical and financial support."

The jury could instead have reasonably believed the opposite. It could have believed that Collins did not confront Norwood about his abuse, just as she did not confront Norwood when she heard the final "loud bang" with no crying afterward. It could have believed that Collins did not ask Norwood to leave because Collins was committed to their relationship and would not "throw [Norwood] under the bus." It could have believed that Collins did not argue with Norwood about his drug use because Collins had used drugs herself, including after Abel was born, and she had at least tolerated Norwood's drug use for a long time prior to that point. It could have believed Collins was not in a compromised physical state because she easily took care of Abel, went to a medical appointment the day before, and was active and mobile in the aftermath of the attack and the days following. Last, it could have believed that Collins was not

reliant on Norwood for physical, practical, or financial support, because she was not physically compromised and they lived with *Collins's* grandmother, after all, not *Norwood's* grandmother, and Collins had friends and former foster parents to help.

The majority's approach reflects a wholesale abandonment of the proper standard of review. The majority has decided for itself what evidence to credit, how conflicts in the evidence should be resolved, and which reasonable inferences based on the evidence to believe. The majority arrogates to itself the right and responsibility to "resolve conflicts in the evidence and weigh the testimony of witnesses." (*Mumin, supra,* 15 Cal.5th at p. 202.) As such, the majority opinion is a " 'clear usurpation of the jury's exclusive function.' " (*Ibid.*)

## V. CONCLUSION

The facts of this case are undeniably tragic. But it was the jury's right and responsibility to determine whether Collins was criminally responsible for this tragedy, along with Norwood, and whether she should be convicted of murder. Under the substantial evidence standard of review and well-established law governing implied malice, it is apparent that a reasonable jury could have relied on the evidence in the record to find Collins guilty of implied malice murder as a direct perpetrator. Whether the members of this court would have come to the same conclusion is — or should be — irrelevant. The judgment

against Collins should be affirmed. Because the majority reaches a contrary conclusion, I respectfully dissent.

**GUERRERO, C. J.**

**I Concur:**

**CORRIGAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Collins

---

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 3/30/23 – 2d Dist., Div. 5
**Rehearing Granted**

---

**Opinion No.** S279737
**Date Filed:** January 6, 2025

---

**Court:** Superior
**County:** Kern
**Judge:** Charles R. Brehmer

---

**Counsel:**

John Steinberg, under appointment by the Supreme Court, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Rachelle A. Newcomb, Amanda D. Carey, Jennifer Oleksa and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John Steinberg
Attorney at Law
P.O. Box 8148
Berkeley, CA 94707-8148
(510) 559-8051

Ian Whitney
Deputy Attorney General
2550 Mariposa Mall, Room 5090
Fresno, CA 93721
(559) 705-2315